569 So.2d 1102 (1990)
Merle MESTAYER, Plaintiff-Appellee,
v.
Roy K. WILLIAMS, Defendant-Appellant.
No. 89-500.
Court of Appeal of Louisiana, Third Circuit.
November 7, 1990.
Suzanne E. LaFleur, New Iberia, for plaintiff-appellee.
Haik & Minvielle, Julius Grubbs, New Iberia, for defendant-appellant.
Before DOMENGEAUX, C.J., and STOKER and YELVERTON, JJ.
STOKER, Judge.

ISSUE
Merle Mestayer brought suit to partition the community property formerly belonging to the community of acquets and gains which existed between her and her former *1103 husband, Roy K. Williams. The property at issue in this appeal concerns 1,264 shares of Halliburton Company stock issued to the husband under the Halliburton Company Career Executive Incentive Stock Plan. The shares of stock were restricted at the time of the dissolution of the community. The issue presented by this appeal is whether the stock is community property or the separate property of the husband. The trial court held that the stock is community property. We agree.

FACTS
The husband and wife were divorced in March 1987. The community of acquets and gains terminated on January 11, 1984. The wife filed a petition for partition of community property on March 23, 1987. The parties, by oral stipulation, divided all items of community property except 1,264 shares of Halliburton stock issued to the husband under the Halliburton Company Career Executive Incentive Stock Plan (Plan).
At the time the community was dissolved, the husband had been issued 876 shares of Halliburton stock which were free of restrictions under the Plan. These shares of stock are not at issue in this appeal. At the time of termination of the community the husband also held 1,370 restricted shares of stock issued under the Plan. The trial judge stated in his reasons for judgment that "of these, 106 shares were returned by Mr. Williams in order to pay federal income tax on the shares, leaving a net of 1,264 shares to be divided between the parties." The parties entered into an oral stipulation which acknowledged the return of the 106 shares of stock and also stipulated that the husband paid $2,727 in taxes from his separate funds on shares which became unrestricted after the termination of the community.
The wife contends that the 1,264 restricted shares are community property to be divided equally between the parties. The husband contends that the 1,264 restricted shares are his separate property because the restrictions did not lapse until after the termination of the community. The parties did not testify in support of their positions. Mr. Robert Kennedy, Vice President of the legal department of the Halliburton Company, testified as to the implementation of the Plan, its provisions and interpretations. Kennedy testified that the Plan represents an incentive tool to reward longtime employees and to retain them for future service to the company. The pertinent provision of the Plan is quoted below.
"Purpose
"The purpose of the Plan is to offer to eligible employees of the Company and its subsidiaries who are, in the opinion of the Committee, largely responsible for the management, growth and protection of the business of the Company, shares of Common Stock at a price substantially below current market price on the New York Stock Exchange, but subject to substantial restrictions against sale, transfer or other disposition for an extended period of time. It is intended by management that the Plan, by offering such employees an ownership interest in the Company, will offer incentives in addition to those of current compensation and future pensions which will encourage valuable employees to continue in the service of the Company and its subsidiaries. Participation in the Plan for eligible employees who are designated by the Committee is entirely voluntary and the Company makes no recommendations to such employees as to whether they should or should not participate."
Mr. Kennedy testified that employees are recommended for the award of shares of common stock by the management of the company. Once such a recommendation has been accepted, the company notifies the employee that he can acquire a number of shares under the Plan for the purchase price of $2.50 per share. The number of shares to be purchased by the employee is also determined by the management. Once the purchase price has been paid by the employee, the company instructs the transfer agent, in this case, Republic Bank, to issue the total number of shares to the individual employee. The shares are then issued pursuant to the terms and conditions *1104 of the Plan and subject to the restrictions quoted below:
"Restrictions
"Shares of Common Stock sold and issued under the Plan are restricted as to sale, transfer, hypothecation or other disposition in accordance with the terms of the Plan (The `Restrictions'). While a recipient of shares under the Plan remain employed, the Restrictions on ten percent (10%) of shares awarded on and after June 1, 1985 shall lapse on each anniversary of the date of issuance, beginning with the first and ending with the tenth; provided that the Committee may in its discretion specify, at the time an award is made, that Restrictions may lapse on the anniversary or anniversaries of the date of issuance over a period of less than ten years.
"With respect to the shares awarded an employee prior to June 1, 1985, Restrictions on such shares will lapse as to six percent (6%) of the shares on each of the first through sixteenth anniversaries of the date of issuance of such shares, with Restrictions lapsing as to all remaining restricted shares on the seventeenth anniversary of the date of issuance; provided, that Restrictions on shares awarded an employee who is forty-six (46) years of age or older at the time an Award is made will lapse in equal annual installments beginning on the first anniversary of the date of issuance and ending on the anniversary of the issuance date next preceding the employee's sixty-third (63rd) birthday. The foregoing notwithstanding, from and after June 1, 1985, Restrictions remaining on shares on the tenth anniversary of the date of issuance shall lapse on such date.
"Notwithstanding anything herein to the contrary, Restrictions on shares which have not lapsed shall lapse on the date on which the employee's employment terminates by reason of death, normal retirement at or after age sixty-five (65), or medical disability retirement.
"If an employee retires prior to age sixty-five (65) with the consent of the Company or employing subsidiary, any shares on which Restrictions have not then lapsed shall be forfeited in accordance with the forfeiture provisions summarized below, unless the Committee approves the retention of all or a portion of such shares by the employee. Restrictions on any shares thus retained shall lapse on the date retention of such shares is approved by the Committee.
"In the event that more than one provision for lapse of Restrictions is applicable, the provision resulting in the earliest lapse of all Restrictions shall be applied.
"The Committee is authorized under the Plan, in its discretion, to accelerate the lapse of Restrictions as to the shares of Common Stock issued to any employee under the Plan in the event of circumstances of unusual hardship to such employee; and, in the event of a tender offer, to accelerate the lapse of Restrictions on any or all of the shares issued to any or all of the employees under the Plan.
"If the employment of the employee is terminated for any reason other than death, medical disability retirement or normal retirement at or after attaining sixty-five (65) years of age, or unless the Committee authorizes, upon retirement prior to age sixty-five (65) with the prior consent of the Company or employing subsidiary, the retention of all or a portion of shares still subject to Restrictions, the shares of Common Stock purchased by the employee under the Plan as to which the Restrictions have not theretofore lapsed must be surrendered to the Company by the employee, and the Company must return to the employee the Purchase Price paid by such employee with respect to such shares.
"If a recipient of shares of Common Stock under the Plan desires to sell any shares as to which the Restrictions have lapsed but is prohibited from doing so without registration pursuant to applicable securities laws, the Company will purchase for cash such shares at their fair market value upon notification by the employee as provided in the Plan."
Certificates bearing a restrictive legend are issued by the company to the individual *1105 employee. The physical possession of the restricted certificates remains with the company. The individual employee receives a copy of the certificates. While a recipient of shares of stock under the Plan remains employed, the restrictions on 10% of the issued shares lapse on each anniversary of the date of issuance.[1] A new certificate representing ownership of the 10% unrestricted shares of stock is then issued to the individual employee. This process continues until all restrictions have lapsed on the issued stock.
To illustrate the Plan's terms and conditions, Mr. Kennedy employed the hypothetical circumstance of the employee being awarded 100 shares of stock as an award for past service and as an incentive to retain the employee for service to the company. After one year from the issuance date of the 100 shares of stock, the restrictions would lapse on 10% of the shares awarded or, 10 shares. A new certificate on the 10 unrestricted shares would be issued to the employee. At that point the employee would be free to sell or pledge the unrestricted shares. After two years from the issuance date of the 100 shares, the restrictions would lapse on another 10% of the shares awarded. This process would continue until the restrictions on all 100 shares had lapsed. Through this scheme the company sought to influence the employee to continue working for the company until all of the restrictions on the shares lapsed.
Finally, Mr. Kennedy testified, and the Plan bears out, that restrictions on shares which have not lapsed, shall lapse on the date on which the employee's employment terminates by reason of death, normal retirement at or after age 65, or medical disability retirement. If the employment of the employee is terminated for any reason other than death, normal retirement or medical disability retirement, the shares purchased by the employee under the Plan which are still restricted must be surrendered to the company by the employee. At that point the company must return to the employee the purchase price paid for the shares. If the employee decides to take early retirement, the restricted shares are forfeited to the company unless the company approves the retention of all or a portion of the shares by the employee.

ASSIGNMENTS OF ERROR
The appellant-husband alleges three assignments of error:
1. That the trial court erred in holding that the 1,264 shares of Halliburton Company stock are community property;
2. That the trial court erred in using the inception of title approach to characterize the nature of the shares of stock;
3. Alternatively, that the trial court erred in not ordering reimbursement of $1,363.50 to the husband for the use of his separate funds in payment of taxes on the disputed shares of stock.

OPINION

ASSIGNMENT OF ERROR NO. 1
The appellant-husband contends that the restricted stock is his separate property. Community property comprises property acquired during the existence of the legal regime through the effort, skill or industry of either spouse. LSA-C.C. art. 2338.
LSA-C.C. art. 2340 provides:
"Things in the possession of a spouse during the existence of a regime of community of acquets and gains are presumed to be community, but either spouse may prove that they are separate property."
The trial court stated in his reasons for judgment the following:
"Most employers offer some sort of a `fringe benefit' package to their employees. This may include a pension at retirement, hospital, medical or dental insurance, group life insurance, disability income protection, paid vacations, or, as in the instant case, stock incentive plans. *1106 In one form or another, these fringes are forms of compensation to the employee."
We agree that the incentive stock plan at issue in this appeal contemplates compensation to the employee. The Plan clearly envisions providing not only a reward for past services to the company but an incentive to retain that employee's services in the future. Even in its restricted state the stock was earned and acquired during the existence of the community.
There are situations in which the problems arise when benefits are earned at the current time but are deferred as to disbursement until a later time. Moreover, some plans provide for delayed vesting of the right to benefits. See G. LeVan, Allocating Deferred Compensation in Louisiana. 38 La.L.Rev. 35 (1977). However, the situation with which we are presented in this case is clearly distinguishable from those situations presenting deferred disbursement or delay in vesting of rights. Contrary to the appellant's contentions, the stock in question became community property when it was issued, not when the restrictions lapsed.
The trial court properly relied on two Supreme Court cases in reaching its decision as to the status of the stock at issue. In Messersmith v. Messersmith, 229 La. 495, 86 So.2d 169 (1956), the husband contended that stock registered in his name should not be divided in kind but that he should be allowed to retain all of the stock and pay his wife only one-half of its book value. To support his contention, he referred to a provision of the charter of the company issuing the stock which required that before the stock is transferred, it had to be offered to the stockholders of the company or its officers.
The Supreme Court held that the husband did not own the stock to the exclusion of the wife. In so doing, the court held that the restrictive provisions in the charter cannot negate the wife's interest as a co-owner in the property. The court stated:
"There is nothing more fundamental in our law than the rule of property which declares that this community is a partnership in which the husband and wife own equal shares, their title thereto vesting at the very instant such property is acquired.... The restriction in the charter cannot affect the status of the stock purchased during the existence of the community or the rights the wife may assert thereunder. Such a restriction cannot negative the wife's present interest as a co-owner, and as a co-owner in community she is clearly entitled to be recognized as such and obtain the exclusive management and control of her vested interest."
The trial court also cited the case of T.L. James & Co., Inc. v. Montgomery, 332 So.2d 834 (La.1976), for the proposition that the right to share in a deferred compensation plan, even though the benefits are due in the future, is a community asset. The trial court stated:
"As stated in T.L. James & Co., Inc. v. Montgomery, 332 So.2d 834, 851 (La. 1976):
"When acquired during the existence of a marriage, the right-to-share (in a retirement plan) is a community asset which at the dissolution of the community, must be so classifiedeven though at the time acquired or at the time of dissolution of a community, the right has no marketable or redeemable cash value, and even though the contractual right to receive money or other benefits is due in the future and is contingent upon the happening of an event at an uncertain time."
On the basis of the facts presented in this case, it is our opinion that the trial court was eminently correct in holding that the shares of stock issued to defendant, Roy K. Williams, constituted property of the community regime which formerly existed between him and plaintiff, Merle Mestayer. Mr. Williams' argument equates the existence of restrictions on the shares of stock to nonownership of the shares. It is clear that the existence of the restrictions does not affect ownership. The restrictions merely qualify the privilege of dealing with the stock. Ownership of the stock, notwithstanding its restricted nature, began the moment Williams exercised *1107 the right to purchase the stock and paid for it at the rate of $2.50 per share. The sole effect which followed the periodic lapsing of restrictions was the lifting of the restriction regarding sale, transfer, hypothecation or other disposition of the stock. There is no merit to the appellant's contention that ownership of the stock did not vest until the restrictions lapsed.
Even in the event that any employee of Halliburton was required to surrender stock to the company under pertinent terms of the Plan, the company was obligated to refund to the employee the amount of the purchase price. In our view, the issuance of restricted stock to Halliburton employees under the company's continued employment incentive plan was little different from the scheme followed in many closely held corporations in which shares issued bear a restriction requiring that before sale to an outsider, the stockholder must offer his stock to the company or other stockholders, usually on a pro rata basis. See T.L. James & Co., Inc. v. Montgomery, supra.
The restricted shares represent a valuable right attributable to employment by the husband during the community's existence. The restricted shares at issue were awarded to the husband during the existence of the community and they were issued to the husband during the existence of that community through the issuance of certificates of stock. Therefore, the restricted shares at issue are an asset of the community. The community interest is not limited to the refund of community funds paid, and the wife's interest is a full and irrevocable proprietary interest in and to one-half of the 1,264 restricted shares of common stock at issue. The trial court correctly awarded this one-half interest to the plaintiff.
Before leaving this issue we note that the appellant has referred us to the case of Kees v. Kees, 509 So.2d 189 (La.App. 1st Cir.1987), which he contends is authority for the proposition that the stock in question in the case before us is his separate property. The case is not apropos. Kees involved severance pay awarded to a husband some ten years after the dissolution of the community. In Kees the court held that severance pay could not be analogized to retirement benefits. The right to severance pay was not earned or acquired during the marriage. It was only acquired when the employer elected to terminate the husband-employee for economic reasons. There was no such thing as periodic payments toward or accrual of the right. It was a one-time payment of a lump sum benefit paid in lieu of future wages. The benefit was analogized to wages received at the time of severance. Thus, the time of acquisition was after the dissolution of the marriage, not during it.
We find that Kees v. Kees, supra, has no application in this case.

ASSIGNMENT OF ERROR NO. 2
The appellant contends that the trial court erred in applying the inception of title approach to characterize the nature of the shares of stock. He argues that the trial court should have followed the vesting of title theory to determine the time of acquisition of the stock in this case. The appellant contends that we should follow this approach and hold that title to the stock had not vested at the time of the dissolution of the community regime. We find no need to discuss the various theories discussed by the appellant because we have already indicated our holding on this point in our discussion under assignment of error number one above.
In appellant's assignment of error number two the appellant is actually making the same argument as was made under his first assignment. From what we have said relative to the first assignment, it is clear that the stock issued to appellant Williams became community property from the moment he paid for it and the stock was issued in his name. The vesting of title took place at that moment and not when restrictions lapsed.
There is no merit to appellant's assignment of error number two.

*1108 ASSIGNMENT OF ERROR NO. 3
The appellant argues alternatively that the trial court erred in not ordering the reimbursement of $1,363.50 to him for the use of his separate funds in payment of taxes on the disputed shares of stock. We agree that the oral stipulation between counsel reflects a reimbursement due the husband for the payment of $2,727 in taxes. The transcription of the oral stipulation covers several pages of the transcript in the record and concludes with the following paragraph:
"In order to not have any testimony today, it is further stipulated that if the Court finds that the restricted shares of stock are community property, and not wholely [sic] the separate property of Roy Williams, then Mr. Williams is entitled to some reimbursement due on these restricted shares of stock on which he had to pay taxes and also on which he had to return some of this stock in order to avoid paying taxes. He paid Two Thousand Seven Hundred and Twenty-seven Dollars in taxes on these restricted shares, and he also had to return a hundred and six shares of stock in order to avoid paying taxes. Therefore, the issue before the Court, now, is whether or not One Thousand, Two Hundred Sixty-four shares of this restricted stock is community or separate."
While this oral recitation is a mixture of two separate ideas, it clearly provides "that if the Court finds that the restricted shares of stock are community property, ... then Mr. Williams is entitled to some reimbursement due on these restricted shares of stock on which he had to pay taxes...." The taxes were paid with his separate funds. The amount of the reimbursement is clear: it is one-half of the $2,727 he expended, or $1363.50.
The trial court made no ruling concerning this reimbursement. Therefore, the trial court's judgment must be amended to reflect the reimbursement.

CONCLUSION
For the foregoing reasons, the judgment of the trial court is amended to reflect that, in addition to the amount which the trial court judgment provides as due to Roy K. Williams as reimbursement from the community, Roy K. Williams is entitled to reimbursement from the community in the amount of $1,363.50 for payment of taxes on community shares of stock paid for by him from his separate funds.
As thus amended, the judgment of the trial court is affirmed. The costs of this appeal are assessed on the basis of three-fourths to appellant, Roy K. Williams, and one-fourth to appellee, Merle Mestayer.
AMENDED, AND AFFIRMED AS AMENDED.
NOTES
[1] The pertinent percentage was 6% prior to June 1, 1985.