927 So.2d 356 (2005)
Mamta Pani RAO
v.
Maheswar RAO.
No. 2005 CA 0059.
Court of Appeal of Louisiana, First Circuit.
November 4, 2005.
Writ Denied March 24, 2006.
*358 Richard Ducote, Jeannine A. Provencher, New Orleans, Counsel for Plaintiff/Appellant Mamta Pani Rao.
Jack M. Dampf, Helen Edgington, Baton Rouge, Counsel for Defendant/Appellee Maheswar Rao.
Before: CARTER, C.J., DOWNING, and GAIDRY, JJ.
GAIDRY, J.
The plaintiff-appellant, Mamta Pani Rao, appeals judgments relating to the valuation and partition of property of the former community of acquets and gains existing between her and the defendant-appellee, Maheswar Rao. For the reasons stated below, we affirm.

FACTS AND PROCEDURAL HISTORY
The parties to this appeal, Maheswar Rao, M.D. (Dr. Rao) and Mamta Pani Rao (Mrs. Rao), entered into a traditional arranged marriage on July 12, 1990, in Bhuvaneswar, India. They subsequently established a matrimonial domicile in Baton Rouge, Louisiana.
Dr. Rao is a gastroenterologist and became a member of his medical group, Gastroenterology Associates, L.L.C., on January 31, 2001. On the same date, he also became a member of another limited liability company, Gastro/Endo Land Company, L.L.C., which owned and managed the medical office property. Similarly, on January 31, 2001, he acquired an ownership interest in Louisiana Endoscopy Center, Inc., a corporation operating an outpatient surgical center in the same building as the physicians' offices. The six physician members of the medical group owned equal interests in each of the legal entities. Thus, Dr. Rao held a one-sixth ownership interest in the corporation, Louisiana Endoscopy Center, Inc. The valuation of that corporate ownership interest is the only aspect of the judicial partition of the community property at issue in this appeal.
In connection with Dr. Rao's acquisition of a one-sixth stock interest in Louisiana Endoscopy Center, Inc., he and Mrs. Rao executed a written acknowledgment on January 31, 2001, that they had read and agreed to the provisions of the corporation's Stockholder Agreement and Articles of Incorporation.[1] On September *359 27, 2001, the six physician stockholders executed an Amended and Restated Stockholders Agreement of Louisiana Endoscopy Center, Inc. (the Amended Stockholders Agreement), which made certain changes to the original Stockholders Agreement. The most significant changes were provisions establishing a stipulated value of $25,000.00 for the stock of each equal stockholder in the event of resignation, death, or termination as a stockholder, or in the event of divorce.
Although Mrs. Rao admittedly signed a multiple original of a spouses' signature sheet for the Amended Stockholders Agreement, the relevant circumstances pertaining to her signature on the document are disputed. Dr. Rao testified that the entire agreement and related documents were provided for her review and signature, while Mrs. Rao testified she was presented with only the spouses' signature sheet. The signatures of the six physician stockholders were all placed on page 18 of the agreement, while each of the six spouses' signatures was executed on a separate multiple original of page 19, the spouses' signature sheet.
Mrs. Rao filed a petition for divorce on November 13, 2001, alleging that she was the victim of verbal and physical abuse by Dr. Rao, and specifically invoked the provisions of the Post-Separation Family Violence Relief Act, La. R.S. 9:361, et seq. She also alleged entitlement to interim and final spousal support and custody of the parties' two children. A judgment of divorce was rendered on July 18, 2002.
The trial court heard Mrs. Rao's request for final spousal support on July 18, 2002, and at the conclusion of the hearing took the matter under advisement. On September 13, 2002, the trial court issued written reasons for judgment on the issue of final spousal support. After describing Mrs. Rao's testimony regarding "several incidents of abuse" occurring over a number of years, the trial court expressed its belief in "Mrs. Rao's testimony regarding the verbal and physical assaults by her husband." Based upon that credibility determination and others, the trial court found Mrs. Rao free from fault in the divorce.
On May 8, 2002, Dr. Rao filed a petition requesting a judicial partition of the community of acquets and gains pursuant to La. R.S. 9:2801. The parties submitted detailed descriptive lists setting forth their respective positions on the community assets, liabilities, and reimbursement claims. The trial of the judicial partition was conducted on August 8, 2003 and December 17, 2003. On February 3, 2004, the trial court issued detailed written reasons for judgment, ruling that the Amended Stockholders Agreement was binding between the parties on the issue of the stipulated stock value of Louisiana Endoscopy Center, Inc. The trial court's judgment in that regard was signed on March 2, 2004.
Dr. Rao filed a motion for new trial on the grounds that the judgment erroneously fixed legal interest on the sum owed to Mrs. Rao from date of judicial demand, rather than date of judgment. On March 15, 2004, Mrs. Rao filed a motion for new trial on the issue of the valuation of Louisiana Endoscopy Center, Inc. Dr. Rao's motion was heard on March 30, 2004, and Mrs. Rao's motion was heard on May 17, 2004. The trial court's judgment granting Dr. Rao's motion for new trial and denying Mrs. Rao's motion for new trial was signed on May 27, 2004. This appeal followed.

ASSIGNMENTS OF ERROR
We summarize Mrs. Rao's assignments of error as follows:
*360 1. The trial court erred in denying her motion for new trial on the judgment of partition of the community property, as that judgment was clearly contrary to the law and the evidence;
2. The trial court erred in determining that Dr. Rao's testimony relating to the Amended Stockholders Agreement was credible, in light of its earlier adverse credibility determination on the issue of fault for final spousal support; and
3. The trial court erred in denying her motion for new trial, by failing to consider the issues relating to the Amended Stockholders Agreement in light of the history and dynamics of domestic violence shown at the trial of the issue of final spousal support.

DISCUSSION

The Nature of the Judgments Appealed
The courts of appeal will review only issues which were submitted to the trial court and which are contained in specifications of assignments or error, unless the interest of justice clearly requires otherwise. Uniform Rules of the Courts of Appeal of Louisiana, Rule 1-3. Based upon the substance of Mrs. Rao's assignments of error, it might be concluded that Mrs. Rao has not properly raised an issue as to the merits of the trial court's valuation of the ownership interest in Louisiana Endoscopy Center, Inc. But as other language in her brief and her motion for appeal clearly expresses her intent to appeal the merits of the judgment of March 2, 2004, we conclude the issue is properly before us.[2]
The long-established rule in this circuit is that the denial of a motion for new trial is not an appealable judgment absent a showing of irreparable injury. Shultz v. Shultz, 02-2534, p. 3 (La.App. 1st Cir.11/7/03), 867 So.2d 745, 746. However, when an unrestricted appeal is taken from a final judgment, the appellant is entitled to seek review of all adverse interlocutory rulings prejudicial to him, in addition to the review of the final judgment. Landry v. Leonard J. Chabert Medical Center, 02-1559, p. 5 n. 4 (La.App. 1st Cir.5/14/03), 858 So.2d 454, 461 n. 4, writs denied, 03-1748, 03-1752 (La.10/17/03), 855 So.2d 761. Thus, the interlocutory denial of a motion for new trial is subject to review on appeal in connection with the review of an appealable judgment in the same case. Moran v. G & G Construction, 03-2447, p. 11 n. 4 (La.App. 1st Cir.10/29/04), 897 So.2d 75, 83 n. 4, writ denied, 04-2901 (La.2/25/05), 894 So.2d 1148.

Standard of Review
An appellate court's review of facts (such as the classification of spouses' property as community or separate) is governed by the manifest error-clearly wrong standard. See Mart v. Hill, 505 So.2d 1120, 1127 (La.1987) and Biondo v. Biondo, 99-0890, p. 4 (La.App. 1st Cir.7/31/00), 769 So.2d 94, 99. However, it is well settled that a trial court has broad discretion in adjudicating issues raised in a judicial partition proceeding under La. R.S. 9:2801. Smith v. Smith, 95-0913, p. 10 (La.App. 1st Cir.12/20/96), 685 So.2d 649, 655. If the trial court's valuations of community *361 assets are reasonably supported by the record and do not constitute an abuse of discretion, its determinations should be affirmed. Ellington v. Ellington, 36,943, p. 6 (La.App. 2nd Cir.3/18/03), 842 So.2d 1160, 1166, writ denied, 03-1092 (La.6/27/03), 847 So.2d 1269.
The standard of review of a denial of a motion for new trial, whether on peremptory or discretionary grounds, is that of abuse of discretion. Magee v. Pittman, 98-1164, p. 19 (La.App. 1st Cir.5/12/00), 761 So.2d 731, 746, writ denied, 00-1684 (La.9/22/00), 768 So.2d 602.

Assessment of Credibility
In this appeal, Mrs. Rao utilizes the trial court's prior credibility determination on one aspect of an unrelated issue, fault for purposes of final spousal support, as the foundation and centerpiece of her contentions that the Amended Stockholders Agreement was the product of a fraudulent scheme and an absolute simulation. She further contends that her consent to that agreement was vitiated by a pattern of domestic violence committed by Dr. Rao, which formed the basis of the prior credibility determination. However, later rulings of the trial court demonstrate that the trial court did not in fact make any factual finding on the issues of "domestic abuse" under La. R.S. 46:2131, et seq., or "family violence" or "domestic violence" under La. R.S. 9:361, et seq.
We initially address Mrs. Rao's second assignment of error relating to the trial court's assessment of Dr. Rao's credibility on the factual issues relating to Mrs. Rao's execution of the spouse's signature sheet of the Amended Stockholders Agreement. Mrs. Rao seems to argue that because the trial court previously accepted her version of facts relevant to the issue of fault for purposes of final spousal support over that of Dr. Rao, the trial court therefore erred in accepting any aspect of Dr. Rao's testimony as credible over hers on any other contested issue.
Mrs. Rao in effect contends that the trial court's prior credibility determination in the context of resolving a different legal issue affords her the benefit of issue preclusion under the doctrine of collateral estoppel. While it is true that credibility is essentially a fact issue, it is not generally the dispositive issue before the trier of fact, but rather a preliminary issue or factor in the determination of the ultimate dispositive issue. As one court has stated, "[i]ssue preclusion requires the issue to be precluded to have been a dispositive issue which the prior court must have considered in a contest between the same parties." Goodman v. Spillers, 28,933, p. 11 (La.App. 2nd Cir.12/23/96), 686 So.2d 160, 167, writs denied, 97-0225, 97-0423 (La.3/27/97), 692 So.2d 393, 400. (Emphasis in original.) It is well settled that in reaching its conclusions, the trier of fact need not accept all of the testimony of any witness as being true or false and may believe and accept any part or parts of a witness's testimony and refuse to accept any other part or parts thereof. Harrigan v. Freeman, 498 So.2d 58, 64 (La.App. 1st Cir.1986). See also Smith v. Roussel, 00-1028, p. 5 (La.App. 1st Cir.6/22/01), 809 So.2d 159, 164.
In summary, a credibility assessment made for the purpose of determining a dispositive issue is generally not itself an adjudicated issue upon which collateral estoppel or issue preclusion can rest. Dr. Rao's overall credibility was not a dispositive issue determined in the prior spousal support hearing, which was narrow in scope; thus, the trial court was free to undertake a new assessment of credibility for purposes of the hearing at issue. Mrs. *362 Rao's second assignment of error has no merit.
Our remaining discussion addresses Mrs. Rao's first and third assignments of error, as they relate to both the judgment of partition and the judgment denying a new trial.

The Merits of the Partition Judgment Valuation
The relevant provisions of the Amended Stockholders Agreement read as follows:
ARTICLE IV.
BUY-OUT AGREEMENT
A. AGREEMENT TO SELL/BUY & VALUATION OF STOCK. Any Stockholder who resigns, dies or is terminated as a Stockholder of Corporation or as a Member of Gastro, as established herein, hereby expressly agrees, and his/her spouse expressly agrees, to sell all of his/her/their stock/ownership interest in this Corporation to said Corporation at the total stipulated value of Twenty-Five Thousand Dollars ($25,000.00), which shall hereinafter be referred to as the "Stock Value". The stockholders hereby expressly authorize the Board of Directors, on behalf of the Corporation, to redeem said stock/ownership interest from Departing Stockholders at the stipulated Stock Value stated above.
* * *
ARTICLE VI.
DIVORCE, SEPARATION, OR DEATH OF A STOCKHOLDER
In the event that a spouse of Stockholder holds an interest in the ownership of the Corporation through the community of acquets and gains in its asset access or in any other manner, then they do appear herein and agree as follows:
A. SEPARATION OR DIVORCE. Upon separation or Judgment of Divorce of any one of the Stockholders, or in any event causing the dissolution of the community of acquets and gains or any partnership or joint ownership existing between a Stockholder and his/her spouse involving ownership in Corporation, then the said spouse hereby irrevocably agrees to sell to his/her corresponding spouse/Stockholder, and the said spouse/Stockholder agrees to purchase the entirety of his/her spouse's undivided interest in the Corporation that may be allocated to him/her. The purchase price, terms of purchase and manner of payments shall be as set forth in Article IV. For purposes of this Article, the Departure Date, or date of valuation, of the said ownership interest shall be from the date of the event causing the termination. In the event of legal separation or divorce, the Departure Date would be the effective date of the termination of the community of acquets and gains. For example, if a petition for divorce and/or the separation is filed effective as of a particular date in the petition, then that date shall be the one on which the value of the community of acquets and gains shall be terminated, even when a judgment is rendered a considerable time after the filing of that said petition for separation and/or divorce.
B. DEATH. In the event of the death of a Stockholder, the Corporation agrees to purchase, and said surviving spouse agrees to sell, the interest of the said deceased spouse/Stockholder and his/her ownership interest in the Corporation. Said purchase shall be as set forth in Article IV herein above. This Agreement shall be binding upon the successors and Assigns of the undersigned *363 Stockholders and their respective spouses. The parties hereto agree to execute any and all documents and instruments that may be necessary in order to consummate the purposes of this Section.
* * *
ARTICLE XI.
SPOUSES OF STOCKHOLDERS
And now to these presents come the spouses of the Stockholders, who did each declare and state that each has read, and hereby agrees to, all of the terms and conditions of this Agreement; that they acknowledge that their individual spouses are the "Stockholders" as defined and noted in this Agreement, with full authority to act under its terms as they may relate to his/her share of the community of acquets and gains or other joint ownership existing between them; and that each said spouse ratifies and confirms the execution by their spouse/Stockholder of this Agreement and, in particular, without limitation, does authorize them as a Stockholder to act under such terms and subject to such conditions as they may deem appropriate, subject only to the limitation that said authority does not extend to actions which would affect their separate and paraphernal assets. Further, that each spouse does agree and consent to all the terms and provisions hereof. Each said spouse does further agree and recognize that any transfer by their spouse/Stockholder of any interest of the Corporation shall constitute a transfer of the entire interest purported to be transferred, and that no additional authorization or consideration for such transfer shall be required, and that they shall join in such transfer (if necessary) upon request of the Corporation. That each spouse does further agree that each of their respective heirs, legatees, legal representatives, successors, transferees, vendees and assigns, shall be bound and obligated by the terms, obligations, restrictions and provisions hereof.
Mrs. Rao contends that the sell/buy and stock valuation provisions of the Amended Stockholders Agreement were actually an absolute simulation under La. C.C. art. 2026, and were the product of a scheme by Dr. Rao and the other physician stockholders to defraud any divorcing spouses of their true interest in community property. She further contends that the agreement was absolutely null as a contract contra bonos mores under La. C.C. art. 2030, or relatively null under La. C.C. art. 2031 based upon her lack of free consent at the time she executed it. She contends that the true value of the community's ownership interest in Louisiana Endoscopy Center, Inc., was between $741,434.00 and $1,038,000.00, as established by her expert accountant's testimony, rather than the stipulated stock value of $25,000.00.
Louisiana Civil Code article 2025 defines a simulation as a contract which the parties mutually agree "does not express the true intent of the parties." A counterletter is a separate written agreement expressing the true intent of the parties to a simulation. La. C.C. art. 2025. An absolute simulation is a contract intended to have no effects between the parties. La. C.C. art. 2026.
The evidence submitted at the trial of the judicial partition of community property simply does not support Mrs. Rao's contention that the Amended Stockholders Agreement was an absolute simulation. Mrs. Rao first raised the issues of fraud and simulation in her motion for new trial; prior to that time, the only issues she raised were whether she validly consented *364 to the agreement and the actual value of the community interest in the corporation. Although the trial court's minute entry for the hearing on Mrs. Rao's motion for new trial recites that evidence was introduced, the transcript of that hearing shows that no new evidence was introduced in support of the motion, let alone evidence of the purported simulation and fraudulent scheme postulated by Mrs. Rao. To the contrary, the extensive record of the judicial partition hearing demonstrates that the stockholder physicians in fact intended the sell/buy provisions of the Amended Stockholders Agreement to produce the effects expressed in the event of any stockholder's death, termination, or divorce. No evidence of a counterletter expressing a contrary intent was introduced.
The Amended Stockholders Agreement expressly provides that "the primary function of the Corporation is to own and operate ambulatory surgical center(s) (hereinafter "ASC"), including any and all necessary and related facilities and equipment," and that ownership was limited to practicing gastroenterologists in the Baton Rouge medical market. Additionally, any existing or potential stockholder must meet the medical practice requirements of 42 C.F.R. § 1001.952(r)(2), a federal "safe harbor" regulation governing "single-specialty" ambulatory surgical centers owned by physicians engaged in the same medical practice specialty.
Dr. Rao presented the testimony of James Barrett Benton, accepted as an expert attorney concentrating in healthcare practice law. Mr. Benton and his father, with whom he practices, prepared the operating agreements for Louisiana Endoscopy Center, Inc. and its affiliated businesses. He testified that the sell/buy and valuation provisions contained within those operating agreements, including the Amended Stockholders Agreement, are "standard" in agreements of that type for physicians' business entities. He also testified that the sell/buy and valuation provisions of the Amended Stockholders Agreement did not afford Dr. Rao any financial advantage over Mrs. Rao in the event of divorce, as compared to any other event to which they applied, such as retirement.
According to Mr. Benton, the change establishing the stipulated stock value was mutually agreed upon by the physician stockholders to rectify what they perceived was an overstated stock value, financially detrimental to the corporation's ongoing business in the event of the departure of a stockholder physician. That change was made with the assistance and advice of the corporation's certified public accountant. Mr. Benton also explained the import of the federal "safe harbor" regulations on the decision to incorporate a stipulated stock value, as well as the financial, tax, and liability advantages of separating the medical group's clinical and surgical practices into two separate legal entities. Finally, he expressed his legal opinion that the sell/buy and valuation provisions were binding on the stockholders' spouses, even without their signatures.
David A. Winkler, C.P.A., the corporation's accountant, was accepted as an expert in his field, and testified that he prepared valuations of each of the business entities, and Dr. Rao's corresponding interests in each, as of the date of termination of the community. He corroborated the testimony of Mr. Benton, and valued Dr. Rao's interest in Louisiana Endoscopy Center, Inc. at $25,000.00, the stipulated stock value, admitting that the figure chosen by the stockholders was "arbitrary" and bore no relation to the "profitability" of the corporation. He further explained the effect of the federal "safe harbor" regulations on the goodwill aspect of corporate valuation. When *365 asked under cross-examination the hypothetical accounting value of Dr. Rao's stock absent the stipulated stock value, Mr. Winkler stated it would be $2,000.00, the amount actually paid and invested by Dr. Rao in acquiring the stock on January 31, 2001.
Mrs. Rao presented the testimony of Ralph J. Stephens, C.P.A., accepted as an expert accountant specializing in business valuations. He prepared a report setting forth a limited "calculation" (as opposed to an actual appraisal) of the "hypothetical" value of Dr. Rao's ownership interest, using the capitalization of cash flow approach, based upon the corporation's financial records and tax returns. His calculation yielded a range of value between $741,000.00 and $1,349,000.00. That calculation was admittedly predicated upon a number of assumptions, including the inapplicability of the stipulated stock value provision. At trial, he affirmed that based upon the documented cash flow of the corporation, assuming a range of discount or capitalization rates, the value to a one-sixth investor in a hypothetical corporation with similar cash flow would fall between $741,434.00 and $1,482,869.00. On cross-examination, Mr. Stephens admitted that if the ability of the business enterprise to generate future cash flow was based upon an intangible asset such as the particular workforce or reputation, the capitalization of earnings approach would represent valuation of goodwill. He also admitted that sell/buy provisions such as the one at issue are commonly incorporated in business operating agreements.
A trial court may accept or reject in whole or in part the opinion expressed by an expert. The effect and weight to be given expert testimony is within the broad discretion of the trial judge. Further, the rule that questions of credibility are for the trier of fact applies to the evaluation of expert testimony, unless the stated reasons of the expert are patently unsound. Burdette v. Drushell, 01-2494, p. 13 (La.App. 1st Cir.12/20/02), 837 So.2d 54, 65, writ denied, 03-0682 (La.5/16/03), 843 So.2d 1132.
When the community asset to be valued in a judicial partition is an interest in a corporation, the court must be careful to value the interest, not just the assets of the business entity. Ellington, 36,943 at p. 6, 842 So.2d at 1166. Business valuation methods are not exact, and are basically guides in determining the fair market value of a business. Given the dynamics of businesses and business practices, and factoring in circumstances that may be unique to the parties, an inflexible formula for determining business value would be impractical. See Achee v. National Tea Company, 95-2556, p. 8 (La.App. 1st Cir.12/20/96), 686 So.2d 121, 125.
The evidence clearly supports the conclusion that the hypothetical value postulated by Mrs. Rao's expert accountant was largely based upon goodwill attributable to the personal qualities and patient relationships of Dr. Rao and his fellow stockholder physicians using the corporate facilities as part of their professional practice. Although Louisiana Endoscopy Center, Inc. is not a professional medical corporation per se, we conclude it was intended by the parties to be an extension of a professional medical practice group in accordance with the federal "safe harbor" regulations.[3] It is inappropriate *366 to use such goodwill attributable to Dr. Rao in the valuation of community corporate stock. See La. R.S. 9:2801.2. See also Preis v. Preis, 94-442, pp. 6-7 (La. App. 3rd Cir.11/2/94), 649 So.2d 593, 595-96 and Depner v. Depner, 478 So.2d 532, 534 (La.App. 1st Cir.1985), writ denied, 480 So.2d 744 (La.1986). Although the issue has not been specifically addressed by the legislature and seems to be res nova, we conclude it is likewise inappropriate to incorporate goodwill attributable to the personal, professional qualities of the other physician stockholders in such valuation. See 16 Katherine S. Spaht and Richard D. Moreno, Louisiana Civil Law Treatise: Matrimonial Regimes § 7.27 (2nd ed.1997; 2004 pocket part).
Stock transfer restrictions do not affect ownership of the stock; they merely qualify the privilege of disposition of the stock. Mestayer v. Williams, 569 So.2d 1102, 1106-7 (La.App. 3rd Cir.1990). Because stock transfer restrictions such as the sell/buy provisions at issue do not alter the nature of the legal matrimonial regime or the classification of stock acquired during marriage as community property, they do not constitute prohibited matrimonial agreements under La. C.C. art. 2329. Guidry v. Guidry, 01-1615, p. 4 (La.App. 3rd Cir.10/30/02), 830 So.2d 570, 572. The latter case involved the divorce of an attorney shareholder of a legal corporation. He and his wife had executed a shareholders agreement and stock subscription agreement which set forth an agreed-upon method of disposition and valuation of shareholder stock in the event of divorce. The appellate court found that the agreements were "valid interspousal contracts which are binding in that we find no derogation of law or public policy." Id.
The evidence shows that the object of the Amended Stockholders Agreement's sell/buy and stock valuation provisions was to establish a stipulated, binding value of equal stock interests in a close corporation with a specialized purpose, in the event of any stockholder's death, termination of ownership, or divorce, and to effect an orderly transfer of ownership according with the corresponding change in ownership interest in the medical group. That object is not contrary to public policy; thus, it is not absolutely null as contra bonos mores. See La. C.C. arts. 7, 2030. See also 7 Glenn G. Morris and Wendell H. Holmes, Louisiana Civil Law Treatise: Business Organizations § 29.10 (1999).
Shares of stock issued in the name of a spouse are subject to management by that spouse exclusively. La. C.C. art. 2351, Revision Comment (a) (1979). See also La. C.C. art. 2352. The undisputed evidence in the record shows that the stock certificate at issue, evidencing ownership of fifty shares of common stock of Louisiana Endoscopy Center, Inc., was issued in Dr. Rao's name only. Thus, Dr. Rao clearly had the right to execute both the original and the Amended Stockholders Agreement, thereby subjecting the stock to the terms of the transfer restrictions and the stipulated stock value, without Mrs. Rao's written assent. Succession of Moss, 00-62, p. 10 (La.App. 3rd Cir.6/21/00), 769 So.2d 614, 620, writ denied, 00-2834 (La.12/8/00), 776 So.2d 462. A stock transfer agreement which is unambiguous, *367 clearly sets forth its terms, and is executed by capable parties is enforceable. Id., 00-62 at p. 10, 769 So.2d 614, 620-21. The sell/buy provisions of Articles IV and VI were valid and binding stock transfer restrictions, and clearly governed the valuation of the stock. See, e.g., Kimball v. Anesthesia Specialists of Baton Rouge, Inc., 00-1954, pp. 15-16 (La.App. 1st Cir.9/28/01), 809 So.2d 405, 416-18, writs denied, 01-3316, 01-3355 (La.3/8/02), 811 So.2d 883, 886.
As for Mrs. Rao's contention that she was presented only the spouses' signature sheet and did not consent to the Amended Stockholders Agreement, the trial court made a considered credibility determination on that point. The trial court evidently accepted Dr. Rao's version of events relating to the presentation of the documents for Mrs. Rao's signature, and rejected her explanation for supposedly signing a one-page blank signature sheet. The trial court's credibility determination is entitled to deference from this court, and is supported by the record. Further, as the trial court held, a party signing a contract is presumed to have consented to its contents, and cannot avoid his obligations by contending that he did not read or fully understand it. A signature to a contract is not a mere ornament. Mobil Exploration & Producing U.S. Inc. v. Certain Underwriters, 01-2219, pp. 13-14 (La. App. 1st Cir.11/20/02), 837 So.2d 11, 24, writs denied, 03-0418 (La.4/21/03), 841 So.2d 805; 03-0417, 03-0427, 03-0438 (La.5/16/03), 843 So.2d 1129, 1130.
The record and the trial court's detailed reasons for judgment demonstrate that it gave full consideration to the testimony and evidence of both parties, and that Mrs. Rao had ample opportunity to present evidence during the hearing of Dr. Rao's supposed fraudulent intent and the effect of the claimed "domestic violence" upon her consent to sign the agreement. As the trial court observed, however, Mrs. Rao "presented no evidence that Dr. Rao was intentionally trying to defraud her or acting against her best interests" in signing the agreement. The trial court's judgment in that regard is fully supported by the record, and we find no abuse of its discretion.

Motion for New Trial
Given our foregoing analysis, the trial court's judgment was not contrary to the law and the evidence. Thus, Mrs. Rao was not entitled to a new trial on that peremptory basis, and the trial court did not abuse its discretion in denying her motion for new trial in that respect. Although Mrs. Rao also contends that a new trial should have been ordered to allow her to conduct discovery and present evidence of fraud and simulation, she failed to put forth any newly discovered evidence which she could not have discovered with due diligence prior to the hearing. See La. C.C.P. art. 1972(2). Our review of the record further discloses no abuse of discretion in the trial court's denial of a new trial on discretionary grounds. See La. C.C.P. art. 1973. Accordingly, the trial court's judgment denying Mrs. Rao's motion for new trial must be affirmed.

DECREE
The judgment of the trial court valuing and partitioning the community property of the parties is affirmed. The judgment of the trial court, denying plaintiff-appellant's motion for new trial on the judicial partition, is also affirmed. All costs of this appeal are assessed to the plaintiff-appellant, Mamta Pani Rao.
AFFIRMED.
DOWNING, J., concurs with reasons.
I respectfully concur with the result reached under these particular facts. I write to explain that generally there is no right to an appeal of the denial of a new *368 trial. The established rule in this circuit is that the denial of a motion for new trial is an interlocutory and non-appealable judgment absent a showing of irreparable harm. Carpenter v. Hannan, 01-0467, p. 4 (La.App. 1 Cir.3/28/02), 818 So.2d 226, 228, citing Morrison v. Dillard Department Stores, Inc., 99-2060, p. 2 (La.App. 1 Cir.9/22/00), 769 So.2d 742, 744. The Louisiana Supreme Court, however, has instructed us to consider an appeal of the denial of a motion for new trial as an appeal of the judgment on the merits, when it is clear from appellant's brief that the appeal was intended to be on the merits. Carpenter, 01-0467 p. 4, 818 So.2d at 228-229. Thus, we are to review the judgment on the merits and not the judgment denying a new trial.
Here, there has been no showing of irreparable harm in that Mrs. Rao does have an adequate remedy through appealing to this court for review and she is appealing the final judgment entered herein. Therefore, Mrs. Rao's first assignment of error is moot and should not be reviewed.
NOTES
[1] Dr. Rao and Mrs. Rao executed similar acknowledgments in connection with his acquisition of membership in the limited liability companies, Gastroenterology Associates, L.L.C. and Gastro/Endo Land Company, L.L.C.
[2] It is also the established practice of the appellate courts, as directed by the supreme court, to treat the appeal of the denial of a motion for a new trial as an appeal of the judgment on the merits, when it is clear from the appellant's brief that he intended to appeal the merits of the case. Smith v. Hartford Accident and Indemnity Company, 254 La. 341, 348-49, 223 So.2d 826, 828-29 (1969); Carpenter v. Hannan, 01-0467, p. 4 (La.App. 1st Cir.3/28/02), 818 So.2d 226, 228-29, writ denied, 02-1707 (La.10/25/02), 827 So.2d 1153.
[3] See 42 C.F.R. § 1001.952(r)(2), relating to "single-specialty" ambulatory surgical centers (ASCs). See also Gregg M. Wallender, Physician Employment, Recruitment Contracts: OIG Issues Final Anti-Kickback Safe Harbors, 43 Res Gestae 14, 18 (2000) ("... ASCs involving physicians who do not perform procedures at their ASC are not afforded protection. The OIG [U.S. Department of Health and Human Services Office of Inspector General] believes only ASCs that involve physicians engaging in an `extension' of their practice warrant protection.... [S]uch individuals must perform services at the ASC and derive at least one-third of their respective medical practice income from all sources for the previous fiscal year or previous 12-month period from their own performance of procedures that require an ASC or hospital surgical setting....").