994 So.2d 668 (2008)
Randall BARNETT
v.
Floyd SAIZON and J. Hunter Development Incorporated.
No. 2008 CA 0336.
Court of Appeal of Louisiana, First Circuit.
September 23, 2008.
*669 Peter J. Losavio, Jr., Kent S. DeJean, Christopher W. Nielson, Baton Rouge, *670 Louisiana, for Plaintiff/Appellee, Randall Barnett.
Steve Joffrion, Prairieville, Louisiana, for Defendants/Appellants, Floyd Saizon and J. Hunter Development, Inc.
Before KUHN, GUIDRY, and GAIDRY, JJ.
GAIDRY, J.
A defendant landowner appeals a judgment awarding a real estate agent the amount of a commission, based upon a listing agreement. For the following reasons, we affirm the judgment.

FACTUAL AND PROCEDURAL HISTORY
On November 18, 2002, J. Hunter Development, Inc. (Hunter) entered into a "Listing and Marketing Agreement" with DeTarnowsky, Schiflett & Kyle, Inc. (DSK), a real estate brokerage firm, to market 41 lots in its subdivision known as "The Lakes at Aubin Wood" in Baton Rouge. The listing agreement had a one-year term. Mr. Floyd Saizon, Hunter's president and sole stockholder, signed the agreement in his purported capacity as "manager" of "J. Hunter Development, LLC." The plaintiff, Randal Barnett,[1] was designated as the "listing agent," and he signed the agreement the same day. Janice R. Schiflett, as DSK's broker, signed the agreement on December 3, 2002.
The nature and amount of the marketing efforts of DSK and Mr. Barnett following the execution of the listing agreement were the subject of conflicting testimony at trial. It is undisputed that on April 1, 2003, Mr. Saizon telephoned Mr. Barnett to advise that he was disappointed with the lack of sales and that Hunter would not be renewing the listing agreement with DSK, apparently on the assumption that the listing agreement's term was for six months. Mr. Barnett thereupon advised Mr. Saizon that the listing agreement was for one year.
On the day following his conversation with Mr. Barnett, Mr. Saizon had an attorney, Steven Todd Hoover, send a letter to Mr. Barnett on behalf of Hunter, advising that "J. Hunter Development, L.L.C." was a nonexistent legal entity, that Mr. Saizon believed the listing agreement expired at the end of April 2003, and that Hunter wished to terminate the listing agreement "immediately." Mr. Hoover concluded by requesting that Mr. Barnett advise him in writing within a week of his receipt if Mr. Barnett had any objection to termination of the agreement. Mr. Barnett responded by telephoning Mr. Hoover and informing him that he was not DSK's designated broker with authority to terminate or modify the agreement, and providing him with Ms. Schiflett's name and address.
Following his conversation with Mr. Barnett, Mr. Hoover contacted the Louisiana Real Estate Commission, who confirmed that any proposed termination of the listing agreement was required to be directed to Ms. Schiflett, the designated broker in the listing agreement. Mr. Hoover then sent another letter dated April 10, 2003 to Ms. Schiflett, advising that Hunter considered the listing agreement terminated according to the terms of the prior letter to Mr. Barnett, but would allow its property to be listed through April 30, 2003. Mr. Hoover requested that any objection to Hunter's proposal be delivered in writing within seven business days from *671 receipt of his letter. Ms. Schiflett did not respond to that second letter.
A closing on a speculative house and lot (commonly called a "spec house") in the subdivision was scheduled on May 5, 2003, and Mr. Saizon, Mr. Hoover, and Mr. Barnett appeared at an attorney's office, together with the prospective buyers. Although Mr. Saizon, on behalf of Hunter, did not contest Mr. Barnett's entitlement to a commission for that sale, the parties at some point discussed the status of the listing agreement relative to the remaining lots in the subdivision. Mr. Hoover telephoned DSK's office in an attempt to discuss the agreement with the broker, Ms. Schiflett, but she was not in the office. Mr. Hoover then spoke to DSK's office manager, Richard McLellan, who purportedly told Mr. Hoover that DSK acknowledged the invalidity of the listing agreement, based upon the non-existent status of the named limited liability company.
On May 5, 2003, the same date as the closing described above, Star Development, L.L.C. entered into a purchase agreement to buy all 40 of Hunter's remaining lots in the subdivision for the total sum of $1,250,000.00. Mr. Hoover had previously telephoned Calvin Blount, one of the members of Star Development, L.L.C., on behalf of Hunter, to inquire about interest in purchasing the property, and had sent a facsimile telecopier letter to Mr. Blount on April 30, 2003, verifying that the subdivision restrictions could be amended, as Mr. Blount had previously requested. On May 29, 2003, Star Development, L.L.C. purchased the 40 lots for the sum previously agreed upon. Under a written "Independent Contractor's Agreement" between him and Hunter, Mr. Hoover was paid a four percent "contingency fee," amounting to $50,000.00, for his work in arranging the sale of the property. Hunter did not notify DSK or Mr. Barnett of Star Development, L.L.C.'s interest, the purchase agreement, or the sale, and no commission was paid to either DSK or Mr. Barnett.
In November 2003, DSK formally assigned its contractual rights under the listing agreement to Mr. Barnett. Mr. Barnett instituted this litigation on February 2, 2004, naming Mr. Saizon and Hunter as defendants. In his petition, he alleged his status as assignee of DSK's rights under the listing agreement, the defendants' breach of that agreement, and his entitlement to recovery of a five percent commission on the sale of the property to Star Development, L.L.C. The defendants answered the petition, denying their liability and alleging that Hunter was not an actual party to the agreement and that the agreement had been terminated by mutual agreement, as well as the affirmative defenses of compensation, or setoff, and equitable estoppel. The defendants also filed a reconventional demand against Mr. Barnett and a third-party demand against DSK, alleging those parties' breach of the listing agreement and negligence, causing financial losses to the defendants.
A bench trial was held on August 2-3, 2007. At the conclusion of the trial, the trial court issued its oral reasons for judgment, ruling in favor of Mr. Barnett and dismissing the defendants' reconventional demand and third-party demand. Its judgment awarding Mr. Barnett the sum of $62,500.00 was signed on August 13, 2007. The defendants filed a motion for new trial, which was heard on October 22, 2007. The trial court granted the motion in part to vacate the judgment insofar as it was rendered against Mr. Saizon in his individual capacity, but denied the judgment in all other respects. Its judgment incorporating that ruling was signed on *672 November 7, 2007. The defendant, Hunter, now appeals.[2]

ASSIGNMENTS OF ERROR
Hunter assigns the following errors on the part of the trial court:
1. The trial court manifestly erred in several factual determinations in its finding that DSK, Inc. complied with the obligations imposed upon it in the Listing and Marketing Agreement of November 18, 2002.
2. The trial court erred as a matter of law, or committed manifest error, in its failure to apply the doctrine of equitable estoppel or detrimental reliance to the facts in the record.

STANDARD OF REVIEW
In order to reverse a factual determination by the trier of fact, the appellate court must apply a two-part test: (1) the appellate court must find that a reasonable factual basis does not exist in the record for the finding; and (2) the appellate court must further determine that the record establishes that the finding is clearly wrong (manifestly erroneous). Stobart v. State through Dep't of Transp. & Dev., 617 So.2d 880, 882 (La.1993). Further, when factual findings are based upon determinations regarding the credibility of witnesses, the manifest error standard demands great deference to the trier of fact's findings. Rosell v. ESCO, 549 So.2d 840, 844 (La.1989).
The manifest error standard of review applies to all factual findings, including a finding relating to the factual (as opposed to legal) sufficiency of evidence to warrant application of a legal theory or doctrine. See Hall v. Folger Coffee Co., 03-1734, p. 10 (La.4/14/04), 874 So.2d 90, 98-99. This standard of review also applies to mixed questions of law and fact, such as the issue of whether the facts found by the trier of fact trigger application of a particular legal standard. See Reed v. Wal-Mart Stores, Inc., 97-1174, pp. 3-5 (La.3/4/98), 708 So.2d 362, 364-5 and 1 Frank L. Maraist & Harry T. Lemmon, Louisiana Civil Law Treatise: Civil Procedure § 14.14 n. 13 (1999).

DISCUSSION

The Listing Agreement
Although Hunter does not expressly assign error to the trial court's obvious rejection of its positions relating to its status as a party to the listing agreement and the agreement's term, its brief reiterates its prior contentions that Hunter, as a corporation, cannot be equated with "J. Hunter Development, L.L.C.," and that the listing agreement was intended to be limited to a six-month term. To the extent that Hunter might be viewed as contesting the trial court's explicit findings to the contrary, articulated in its oral reasons for judgment, we will briefly address those issues.
Throughout the course of their dealings after the listing agreement was signed, the parties clearly had no misunderstanding as to the identity of the entity on whose behalf Mr. Saizon signed. Both parties understood the seller to be the record owner of the property, J. Hunter Development, Inc., and Mr. Saizon acknowledged at trial that he signed the agreement on *673 behalf of the corporation.[3] The mistaken designation of Hunter as a limited liability company in the listing agreement does not relieve it of its obligations under that agreement.
The listing agreement on its face specifies a one-year term. Immediately above Mr. Saizon's acknowledged signature is the single sentence, "I/We have read and understand the above." A party signing a contract is presumed to have consented to its contents, and cannot avoid his obligations by contending that he did not read or fully understand it. A signature to a contract is not a mere ornament. Rao v. Rao, 05-0059, p. 17 (La.App. 1st Cir.11/4/05), 927 So.2d 356, 367, writ denied, 05-2453 (La.3/24/06), 925 So.2d 1232. Although Hunter offered testimony at trial challenging the circumstances of the agreement's execution and its intended term, the trial judge weighed the conflicting evidence and found that Hunter had failed to controvert the written terms of the agreement. Its decision in that regard is not clearly wrong.

DSK's Performance Under the Listing Agreement
The listing agreement contained the following provision:
Seller's Designated Agent is Seller's sole and exclusive agent with exclusive right to market and to sell, exchange or otherwise arrange to transfer the above described real property at the price as above outlined, or any other price that Seller agrees to accept. Seller agrees to pay Broker professional brokerage fees amounting to ... 5 percent of the gross amount of any agreement to sell, exchange or other type of transfer. This brokerage fee is earned when Seller enters into any agreement to sell, exchange or otherwise transfer title to a purchaser.
Given the foregoing, the listing agreement at issue was clearly an exclusive listing agreement, as the trial court correctly determined. Under an exclusive listing agreement, the broker is entitled to his commission on a sale made during the term of the agreement whether or not his efforts contribute to the sale. Miller v. Aguilar/Wilson, Inc., 435 So.2d 1069, 1070-71 (La.App. 1st Cir.1983), writ denied, 441 So.2d 764 (La.1983). As the sale to Star Development, L.L.C. was made during the one-year term of the listing agreement, Mr. Barnett, as DSK's assignee, would thus appear to be entitled, without more, to recovery of the commission. However, Hunter alleged and presented evidence in an attempt to prove that DSK and Mr. Barnett failed to comply with their obligations to exercise reasonable skill and diligence in marketing the property. Because that evidence was relevant to Hunter's reconventional demand and third-party demand, as well as its defense of compensation or setoff, the trial court found it necessary to determine the merits of that issue.
*674 Hunter contended that DSK and Mr. Barnett did very little to market the property after the listing agreement was signed, other than to list one lot on the Multiple Listing Service (MLS) of the Greater Baton Rouge Association of Realtors and to add a corner "snipe" or overlay notice bearing the language, "Lots for Sale." Hunter further contended that any other marketing efforts had been done under an earlier agreement between DSK and the prior owner of the subdivision, Hayden Associates, L.L.C., from whom Hunter purchased it. Hunter presented testimony from Mr. Saizon, his wife, and Alan Harris, the bank officer who managed the financing of the subdivision.
Mr. Barnett, on the other hand, presented his own testimony, that of his brother, another real estate agent who assisted him in marketing the subdivision, and the testimony of Betty Phelps Black, accepted by the trial court as an expert in the field of real estate. Their testimony and Mr. Barnett's documentary evidence stood in marked contrast to that of Hunter's witnesses. The trial court, in its oral reasons for judgment, described its assessment of the credibility of the opposing witnesses in detail, and obviously gave considerable weight to Ms. Black's opinion testimony that Mr. Barnett's marketing efforts were appropriate, adequate, and professional.
The trial court's determination that Mr. Barnett and DSK complied with their duties under the listing agreement necessarily involved the weighing of conflicting evidence and considered assessment of witness credibility. Its findings are therefore entitled to deference from this court, and we find no manifest error in them.

Detrimental Reliance
The theory of detrimental reliance, also referred to as promissory or equitable estoppel, is based upon La. C.C. art. 1967, which provides, in pertinent part, that "[a] party may be obligated by a promise when he knew or should have known that the promise would induce the other party to rely on it to his detriment and the other party was reasonable in so relying." May v. Harris Mgmt. Corp., 04-2657, p. 5 (La.App. 1st Cir.12/22/05), 928 So.2d 140, 144. The doctrine of detrimental reliance is designed to prevent injustice by barring a party from taking a position contrary to his prior acts, admissions, representations, or silence. Suire v. Lafayette City-Parish Consol Gov't, 04-1459, 04-1460, 04-1466, p. 31 (La.4/12/05), 907 So.2d 37, 59. To establish detrimental reliance, a party must prove three elements by a preponderance of the evidence: (1) a representation by conduct or word; (2) justifiable reliance; and (3) a change in position to one's detriment because of the reliance. Id. It is difficult to recover under the theory of detrimental reliance, because estoppel is not favored in our law. May, 04-2657 at p. 6, 928 So.2d at 145.
Even if Hunter, through Mr. Saizon, indeed relied upon DSK's failure to respond to Mr. Hoover's April 10, 2003 letter and the alleged representations of Mr. McLellan, the trial court evidently concluded that any such reliance was not justifiable. The trial court expressly stated, in its oral reasons for judgment, that Mr. Hoover's two letters seeking to unilaterally terminate the listing agreement were ineffectual. It further observed that Mr. Hoover was fully aware that only Ms. Schiflett, the designated broker, had authority on behalf of DSK to agree to terminate the listing agreement.
Hunter implies that it was entitled to rely upon Mr. McLellan's purported acknowledgment of the listing agreement's invalidity and waiver of DSK's right under it, based upon his status as DSK's office manager. One who seeks to benefit from the apparent authority doctrine may not *675 blindly rely even on assertions of an agent. The person who deals with an agent, by the mere fact of agency, is given both the right and duty to determine, at his peril, whether the agency purportedly granted by the principal will permit the proposed act by the agent. Dorian M. Bennett, Inc. v. Shankle, 07-0703, p. 11 (La.App. 4th Cir.12/28/07), 974 So.2d 777, 783. The trial court noted that Mr. McLellan testified at trial that he could not recall the substance of his conversation of May 5, 2003 with Mr. Hoover, but Mr. McLellan testified that he had no authority to agree to terminate the listing agreement on DSK's behalf. His testimony in that regard was clearly corroborated by the testimony of Mr. Barnett and Mr. Hoover identifying Ms. Schiflett as the proper person with authority to do so. Given the strong evidence presented confirming that Mr. Hoover had already been negotiating the prospective sale to Star Development, L.L.C. prior to April 30, 2003, the trial court's conclusion that Hunter did not rely to its detriment on any statement of Mr. McLellan on May 5, 2003 was justified.
The trial court concluded that the only detrimental reliance shown by the evidence was Hunter's reliance on Mr. Hoover's inaccurate legal advice as to the listing agreement's validity. It similarly determined that Hunter failed to prove the requisite elements of detrimental reliance by a preponderance of the evidence, in particular, the elements of justifiable reliance and change in position due to such reliance. Those findings are fully supported by the record, and are not manifestly erroneous.
As trier of fact, the trial court resolved all of the contested factual issues in favor of Mr. Barnett. As there are two permissible views of the evidence related to those issues, requiring an assessment of the credibility of the witnesses and the weighing of the evidence, the trial court's determination is entitled to deference and cannot be considered manifestly erroneous. See Stobart, 617 So.2d at 883.
The judgment of the trial court is affirmed. All costs of this appeal are assessed to the defendant-appellant, J. Hunter Development, Inc.
AFFIRMED.
NOTES
[1] Mr. Barnett's first name is actually "Randal," but was inadvertently spelled "Randall" in his petition.
[2] Although the motion for a suspensive appeal and the appellants' brief were submitted on behalf of both Mr. Saizon and J. Hunter Development, Inc., Mr. Saizon was not ultimately cast in judgment, and unfortunately died prior to the hearing of this appeal. No party has been substituted in his place as appellant, so our references to the defendant from this point forward are to the defendant corporation only.
[3] Mr. Saizon's trial testimony also reflects initial confusion on his part as to whether the entity formed for the purpose of owning and selling the property was a limited liability company, as opposed to a corporation. At any rate, the evidence also shows that on December 17, 2002, Mr. Saizon executed a "Notice" on behalf of Hunter, using its correct corporate name, identifying the corporation as the developer of The Lakes at Aubin Wood subdivision, and designating Mr. Saizon and Mr. Barnett as members of the subdivision's architectural control committee. The trial evidence further reveals that Mr. Saizon subsequently executed several documents on behalf of J. Hunter Development Corporation. Under these circumstances, Hunter's argument relating to its proper legal name for purposes of the listing agreement might reasonably be viewed as disingenuous.