818 So.2d 226 (2002)
Daryl Wayne CARPENTER and Elizabeth Y. Carpenter, on Their Own Behalf and as Administrators of the Estate of Their Minor Child, Kristen Danielle Carpenter
v.
Gerald V. HANNAN and Louisiana Medical Mutual Insurance Group.
No. 2001 CA 0467.
Court of Appeal of Louisiana, First Circuit.
March 28, 2002.
Rehearing Denied May 22, 2002.
*227 John P. Aydell, Jr., Sam D'Amico, Baton Rouge, for Plaintiffs-Appellees Daryl Wayne Carpenter, et al.
George M. Cotton, Baton Rouge, for Defendant-Appellant Patients' Compensation Fund.
Before: FOIL and PETTIGREW, JJ., and KLINE,[1] J. Pro Tem.
PETTIGREW, Judge.
Following a jury trial in this medical malpractice action, a verdict was returned in favor of the plaintiffs. The Louisiana Patients' Compensation Fund ("PCF") filed a motion for new trial, which was denied by the trial court. This appeal by the PCF followed.

FACTS
Kristen Danielle Carpenter was born on June 16, 1987. Her treating pediatrician at the time was Dr. Gerald V. Hannan, who first saw Kristen on June 30, 1987. Kristen's parents, Daryl Wayne Carpenter and Elizabeth Y. Carpenter, indicated that during the first eighteen months of Kristen's life, they advised Dr. Hannan that Kristen had an apparent leg length discrepancy, asymmetrical skin folds in her upper inner right thigh, and a turned out foot. Dr. Hannan testified that he did not recall any conversations with Kristen's parents concerning the above complaints.
Dr. Hannan noted that in November of 1988, Kristen's right foot was turned out at about 20 to 30 degrees when she walked, but indicated that this was a "typical amount of turning out" for a child her age. He further added that he found no significant deviation in leg length and no abnormal fat roll in Kristen's right upper thigh. It was not until January 3, 1989, that Dr. Hannan noticed an "obvious turning" of Kristen's leg. During this office visit, Elizabeth Carpenter initiated a discussion about bringing Kristen to Dr. Charles Strange, an orthopedic surgeon, for consultation. Dr. Hannan testified that at this time, he suspected Kristen had a dislocated hip but did not relay his suspicions to Kristen's parents. Rather, he referred *228 Kristen to Dr. Strange, who, on January 4, 1989, diagnosed Kristen as having a dislocated right hip. Dr. Strange subsequently referred Kristen to Dr. James T. Bennett, who specializes in pediatric orthopedics.
Over the next two years, Kristen underwent a course of treatment that consisted of the following: 1) traction for approximately one month; 2) a closed reduction of the right hip and a percutaneous right adductor tenotomy with the application of two Spica body casts, each of which remained on for a period of six weeks; 3) the application of an Ilfeld brace (a brace with a bar in between the legs to keep the legs apart) that was worn twenty-four hours a day for approximately seven months and then only at night for another six months; 4) a Salter osteotomy with the insertion of threaded pins and the application of a Spica body cast for six weeks; and 5) the application of an abduction brace (similar to the Ilfeld brace) for a period of ten weeks.

PROCEDURAL HISTORY
On January 2, 1990, the Carpenters, individually and on behalf of Kristen, filed a complaint and request for medical review panel against Dr. Hannan. By agreement of the parties, the panel proceeding was waived and the instant suit was instituted against Dr. Hannan and his insurance carrier, Louisiana Medical Mutual Insurance Company; wherein it was alleged that Dr. Hannan failed to exercise the requisite degree of care in treating Kristen and in failing to diagnose Kristen's dislocated hip. A settlement was ultimately reached between the parties whereby Louisiana Medical Mutual Insurance Company paid the Carpenters $99,000.00 on behalf of Dr. Hannan. In a petition requesting judicial approval of the settlement, the Carpenters named the PCF as a defendant. The settlement was approved by the court, and it was ordered that the proceeds of the settlement be distributed as follows: 70 percent to Kristen's tutor on her behalf, 15 percent to Daryl Carpenter, and 15 percent to Elizabeth Carpenter. Subsequently, the Carpenters' claim, as it pertained to the PCF, proceeded to trial.
Following a jury trial in November of 1993, verdict was rendered in favor of the PCF, dismissing the Carpenters' claims with prejudice. Thereafter, the Carpenters filed a motion for a new trial, which motion was granted by the trial court. The PCF applied for a supervisory writ of review to this court in docket number 95 CW 0236. In an order dated July 3, 1995, this court granted the writ, vacated the trial court's judgment granting the motion for a new trial, and reinstated the jury's original verdict. On November 17, 1995, in docket number 95 CC 2006, the Louisiana Supreme Court granted the Carpenters' writ of certiorari, reversed the previous judgment of this court, and reinstated the judgment of the trial court ordering a new trial.
The second trial of this matter was conducted in January of 2000. After hearing the evidence, the jury rendered a verdict in favor of the Carpenters, and a judgment was signed accordingly on February 24, 2000. The PCF filed a motion for a new trial, which was denied by the trial court in a judgment rendered on October 23, 2000. The PCF has appealed from the judgment denying the motion for a new trial.
The denial of a motion for a new trial is not an appealable judgment absent a showing of irreparable harm. Morrison v. Dillard Department Stores, Inc., 99-2060, p. 2 (La.App. 1 Cir. 9/22/00), 769 So.2d 742, 744, writ denied, XXXX-XXXX (La.2/2/01), 784 So.2d 646. However, the supreme court has directed us to consider an appeal of the denial of a motion for new *229 trial as an appeal of the judgment on the merits as well, when it is clear from the appellant's brief that he intended to appeal the merits of the case. See Reno v. Perkins Engines, Inc., 98-1686, p. 2 (La.App. 1 Cir. 9/24/99), 754 So.2d 1032, 1033, writ denied, 99-3058 (La.1/7/00), 752 So.2d 863. It is obvious from the PCF's brief that it intended to appeal the judgment on the merits. Thus, we will treat the appeal accordingly.
On appeal, the PCF assigns the following specifications of error:
I. The Judge committed reversible error by entering the jury room during deliberations.
II. The Judge erred by having the jury hear audio tapes of a child crying, thus appealing to the Jury's emotions.
III. The Judge erred by failing to overturn a jury finding that plaintiff suffered harm which would not otherwise have occurred.
IV. The Judge improperly advised [the] jury that Dr. Hannan was a former defendant.
V. The Judge erred by submitting improper jury verdict forms.
VI. The Judge erred by permitting plaintiff to submit learned treatises and medical journals to the jury.
VII. The Judge erred by failing to overturn awards for mental pain and anguish, where plaintiff failed to meet his burden of proof.
VIII. The Judge erred by permitting the jury to award future medicals.

JUDICIAL MISCONDUCT
In its first assignment of error, the PCF assigns error to the trial judge's failure to follow the dictates of La.Code Civ. P. art. 1796. Citing Owens v. Concordia Electric Cooperative, 95-1255 (La.App. 3 Cir. 6/25/97), 699 So.2d 434, writs denied, 97-2698, 97-2728, 97-2736 (La.1/9/98), 705 So.2d 1113, 1120, the PCF contends the trial judge's interference with jury deliberations, by entering the jury room without prior notice to the parties, is deemed presumptively prejudicial and constitutes reversible error. Based on this error by the trial judge, the PCF asserts the case should be remanded to the trial court for a new trial. We agree, and therefore, pretermit consideration of the remaining assignments of error.
Louisiana Code of Civil Procedure article 1796 provides as follows:
A. If the jury, after retiring for deliberation, desires to receive information on any point of law, they shall be conducted to the courtroom.
B. After giving notice to the parties, the court may give the appropriate instructions.
C. The court, after giving notice to the parties, may recall the jury after they have retired:
(1) To correct or withdraw an erroneous instruction.
(2) To clarify an ambiguous instruction.
(3) To inform the jury on a point of law which should have been covered in the original instructions.
(4) To give such further instructions as may be appropriate.
Thus, under Article 1796, a trial judge who wishes to communicate with an impaneled jury must give both parties notice of his intentions and recall the jury to the courtroom. A judge who communicates with a jury without notifying the parties and recalling them to the courtroom, so that the interchange may be entered into the record, does so at its peril. Lawson v. Straus, 98-2096, p. 7 (La.App. 4 Cir. 12/8/99), 750 So.2d 234, 239, writ denied, XXXX-XXXX (La.3/17/00), 756 So.2d 1144. *230 All such communications will be subject to close scrutiny by an appellate court. Id.
The record of the events at issue are less than clear. After being instructed on the law by the trial judge, the jury began deliberations. Apparently, counsel were later summoned to the judge's chambers and told the jury had a question about the verdict form. The judge then went into the jury room and read a new verdict form to the jury. At some point thereafter, the judge returned the jury to the courtroom and read the new verdict form into the record. The minute entry corresponding to these events is as follows: "At 7:20 p.m., the Court informed by the bailiff that the jury needed additional instructions. At which time, the Court sent additional instructions to jury. At 8:00 p.m., the jury returned to the courtroom and received additional instructions on the record." There is nothing in the record that reveals what happened from the time the judge first learned of the jury's question and the time the jury was returned to the courtroom.
At some point thereafter, the judge went back on the record to address another note from the jury. The court ordered the clerk to file the note into the record, and the parties came to an agreement on what exhibits would be provided to the jury. After this matter was resolved, counsel for the PCF was allowed to put his objection on the record concerning the judge entering the jury room to deliver the revised verdict form.
It is unclear from the record before us what events preceded the judge entering the jury room. The judge's recollection of what transpired was as follows:
[A]s you might recall I was seated in chambers when the bailiff came to get me, to ask me to gothat the jury wanted to see me. I asked you, at that point, you [Mr. Cotton] and Mr. Aydell and Mr. D'Amico, and you all said, yes.
. . . .
... And I went and I got the note because they hadn't reduced it to writing,[[2]] and I came back with the form and I told you exactly what the problem was. Thereafter, I entertained discussion with counsel for at least 30 minutes, confecting a new form, and ask[ed] you at this point, now, you want me to read this and deliver this to the jury? And the answer was again yes.
Counsel for the plaintiffs agreed with the judge's "chronology of events." Counsel for the PCF, however, strenuously objected. According to counsel for the PCF, he had requested that they "go back on the record" before the judge entered the jury room, indicative that there had been some off-the-record discussion about the issue in chambers. However, we are unable to tell from the record before us what this discussion entailed and whether there had been an agreement that the judge would enter the jury room to deliver the revised verdict form.
Nonetheless, regardless of whether counsel for the PCF agreed to allow the judge to enter the jury room to deliver the revised verdict form, the judge's actions in this case constituted clear error and rose to the level of impairing the administration of impartial justice. Article 1796 uses mandatory language in explaining that if a jury has begun deliberation and desires to receive information on any point of law, they shall be conducted to the courtroom. *231 In the instant case, the judge clearly violated the dictates of Article 1796 by entering the jury room to address the jury's questions, rather than returning the jury to the courtroom as required by law. Such behavior threatens the integrity of the deliberation process and we cannot sanction same. Having determined that the trial court erred in this regard, we turn now to a consideration of whether a remand is warranted.
The Louisiana Supreme Court has concluded that where a jury verdict is "tainted" due to a material error at trial but an otherwise complete trial record exists, the general rule is that an appellate court should, if it can, render judgment on the record. Jones v. Black, 95-2530, p. 1 (La.6/28/96), 676 So.2d 1067. However, "[w]here a view of the witnesses is essential to a fair resolution of conflicting evidence, the case should be remanded for a new trial." Ragas v. Argonaut Southwest Insurance Co., 388 So.2d 707, 708 (La. 1980) (emphasis added).
We have thoroughly reviewed the record in this case and conclude that the jury's verdict was based heavily on credibility determinations made after hearing from the parties and the various witnesses who testified. Faced only with a cold record and conflicting evidence, resolution of which depends on a first-hand view of the witnesses, we are convinced that this case must be remanded to the trial court for a new trial on the merits.

CONCLUSION
For the above and foregoing reasons, the judgment of the trial court is vacated and the case is remanded to the trial court for a new trial on the merits. All costs associated with this appeal are assessed equally against the parties.
TRIAL COURT JUDGMENT VACATED; REMANDED FOR NEW TRIAL.
NOTES
[1] Judge William F. Kline, Jr., retired, is serving as judge pro tempore by special appointment of the Louisiana Supreme Court.
[2] It is interesting to note that several of the jurors, including the jury foreman, subsequently testified at a hearing on a motion for a new trial regarding these events. According to the jurors, the question was reduced to writing by the jury foreman and given to the bailiff. Thereafter, the judge entered the jury room with a new jury form.