971 So.2d 323 (2007)
Jerry M. McCAIN, Sr. and Margaret B. McCain, Individually and on Behalf of Their Minor Children Jerry M. McCain, Jr. and Colt E. McCain
v.
Sara A. HOWELL, Louisiana Indemnity Company, State of Louisiana Through Department of Transportation and Development and Allstate Insurance Company.
No. 2006 CA 1830.
Court of Appeal of Louisiana, First Circuit.
September 14, 2007.
Writ Denied December 14, 2007.
*325 Michael C. Palmintier, Baton Rouge, for Plaintiffs-Appellees Jerry M. McCain, Sr., et al.
Christopher Moody, Hammond, for Defendant-Appellant LA DOTD.
Before: CARTER, C.J., PETTIGREW, and WELCH, JJ.
PETTIGREW, J.
The State of Louisiana, through the Department of Transportation and Development ("DOTD"), appeals from the tria court judgment in favor of plaintiffs, wherein the court apportioned 50 percent of the fault for causing the accident in question to DOTD and awarded plaintiffs damages totaling $7,786,018.73. For the reasons set forth below, we affirm.

FACTS
On May 3, 1992, at approximately 3:00 p.m., Sara A. Howell was operating a 1980 Chevrolet Camaro in a southerly direction on Highway 37 in St. Helena Parish, Louisiana, when, for some unknown reason, she lost control of the vehicle and veered off the roadway to the left. Once off the roadway, Ms. Howell encountered a ditch and was unable to steer back onto the roadway. According to the record, Ms. Howell's vehicle then struck a culvert that was directly in her path but, apparently, not within view, because of thick vegetation *326 that had grown over the culvert. Plaintiffs, Jerry M. "Mike" McCain, Margaret B. McCain, Jerry M. McCain, Jr., and Colt E. McCain, were passengers in the Howell vehicle at the time of the accident, and all sustained injuries as a result of this very violent collision.

PROCEDURAL HISTORY
Following this accident, plaintiffs filed an action for damages, naming as defendants Ms. Howell, Louisiana Indemnity Company, in its capacity as Ms. Howell's liability insurer, DOTD, and Allstate Insurance Company, in its capacity as plaintiffs' uninsured/underinsured motorist insurer. Prior to the trial of this matter, plaintiffs dismissed their claims against Ms. Howell, Louisiana Indemnity Company, and Allstate Insurance Company, leaving only their claims against DOTD viable for trial.
The matter proceeded to a bench trial in November 2005, at which time the trial court heard testimony from numerous witnesses and accepted various documents into evidence. At the close of evidence, the trial court rendered a verdict in favor of plaintiffs, assigning 50 percent of the fault to Ms. Howell and 50 percent to DOTD, and awarding plaintiffs damages totaling $7,786,018.73. DOTD subsequently filed a motion for new trial, arguing that the trial court applied an improper legal standard in finding that the highway at issue posed an unreasonable risk of harm and in assigning liability to DOTD. On June 1, 2006, the trial court denied the motion for new trial. This appeal[1] by DOTD followed, wherein the following specifications of error were assigned:
1. The trial court applied the improper legal standard in imposing liability on DOTD because liability cannot be imposed absent a defective condition of the roadway that contributed to or caused the accident.
2. DOTD cannot be responsible for accidents when the cause-in-fact of the accident was due to driver error because DOTD's duty is to maintain public roadways in a condition that they do not pose an unreasonable risk of harm to motorists exercising ordinary care and reasonable prudence.

3. The trial court improperly admitted hearsay testimony into evidence over the objection of counsel for defense.
4. The trial court was manifestly erroneous in awarding approximately eight million dollars ($8,000,000) in damages to the plaintiffs.

LIABILITY OF DOTD

(Assignments of Error Numbers One and Two)
DOTD argues on appeal that the trial court erred in finding it liable for this accident, as liability cannot be imposed on DOTD absent a defective condition of the roadway. Noting the alleged defects found by the trial court, i.e., the placement *327 of the culvert, the slope of the embankment, and the high vegetation obscuring the culvert, were not defects in areas intended for vehicular travel, DOTD contends the trial court's finding of liability is manifestly erroneous and warrants reversal. Moreover, DOTD maintains it cannot be held liable for the accident because the cause-in-fact of the accident was driver error and not due to any defect in the actual roadway. Thus, DOTD concludes Ms. Howell should have been assessed with 100 percent of the fault for the accident.
To the contrary, plaintiffs argue that the facts of this case establish a duty on the part of DOTD that extends beyond the paved surface of the roadway. Plaintiffs contend that the trial court's ruling was based on "extensive evidence and the uncontradicted testimony of plaintiffs' experts that a combination of unreasonably dangerous conditions substantially contributed to this terrible accident." With regard to whether these unreasonably dangerous conditions were a cause-in-fact of their injuries, plaintiffs assert the trial court correctly employed the duty-risk analysis and concluded that DOTD and Ms. Howell were equally at fault in causing the accident. Thus, plaintiffs maintain the trial court's finding cannot be disturbed on appeal. We agree.
Under Louisiana jurisprudence, most negligence cases are resolved by employing a duty-risk analysis. The determination of liability under a duty-risk analysis usually requires proof of five separate elements, all of which must be answered affirmatively for the plaintiff to recover: (1) proof that the defendant had a duty to conform his conduct to a specific standard of care (the duty element); (2) proof that the defendant failed to conform his conduct to the appropriate standard (the breach of duty element); (3) proof that the defendant's substandard conduct was a cause-in-fact of the injuries (the cause-in-fact element); (4) proof that the defendant's substandard conduct was a legal cause of the injuries (the scope-of-liability or scope-of-protection element); and (5) proof of actual damages (the damages element). Conerly v. State of Louisiana ex rel. the Louisiana State Penitentiary and the Department of Corrections, XXXX-XXXX, pp. 8-9 (La.App. 1 Cir. 6/27/03), 858 So.2d 636, 645, writ denied, 2003-2121 (La.11/14/03), 858 So.2d 432. A negative answer to any of the inquiries of the duty-risk analysis results in a determination of no liability. Perkins v. Entergy Corp., XXXX-XXXX, p. 7 (La.3/23/01), 782 So.2d 606, 611.
Generally, the initial determination in the duty-risk analysis is cause-in-fact. Cause-in-fact usually is a "but for" inquiry that tests whether the accident would or would not have happened but for the defendant's substandard conduct. Boykin v. Louisiana Transit Co., Inc., 96-1932, p. 9 (La.3/4/98), 707 So.2d 1225, 1230. When there are concurrent causes of an accident, which nevertheless would have occurred in the absence of one of the causes, the proper inquiry is whether the conduct under consideration was a substantial factor in bringing about the accident. Perkins, XXXX-XXXX at 8, 782 So.2d at 611. The Perkins court explained the "substantial factor" test as follows:
To satisfy the substantial factor test, the plaintiff must prove by a preponderance of the evidence that the defendant's conduct was a substantial factor bringing about the complained of harm.
This court has made several different inquiries when applying the substantial factor test. For example, the court has stated that when there are multiple causes, clearly cause-in-fact exists when the plaintiff's harm would not have occurred *328 absent the specific defendant's conduct. The court has also applied the substantial factor test by asking whether each of the multiple causes played so important a role in producing the result that responsibility should be imposed upon each item of conduct, even if it cannot be said definitively that the harm would not have occurred "but for" each individual cause. Additionally, in LeJeune v. Allstate Ins. Co., 365 So.2d 471, 475 (La.1978), the court, in describing the substantial factor test, stated that "one must consider whether the actor's conduct has created a force or series of forces which are in continuous and active operation up to the time of the harm."
Perkins, XXXX-XXXX at 8-9, 782 So.2d at 612 (citations omitted).
The determination of cause-in-fact is a factual question to be decided by the fact finder and, thus, subject to the manifest error standard of review. See O'Connor v. Litchfield, XXXX-XXXX, p. 11 (La.App. 1 Cir. 12/31/03), 864 So.2d 234, 242. In order to reverse a fact finder's determination of fact, an appellate court must review the record in its entirety and (1) find that a reasonable factual basis does not exist for the finding, and (2) further determine that the record establishes that the fact finder is clearly wrong or manifestly erroneous. Stobart v. State through Dept. of Transp. and Development, 617 So.2d 880, 882 (La.1993). Further, on review, an appellate court must be cautious not to reweigh the evidence or to substitute its own factual findings just because it would have decided the case differently. Ambrose v. New Orleans Police Dept. Ambulance Service, 93-3099, p. 8 (La.7/5/94), 639 So.2d 216, 221. The manifest error standard demands great deference to the trier of fact's findings; for only the fact finder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said. Rosell v. ESCO, 549 So.2d 840, 844 (La.1989). Thus, where two permissible views of the evidence exist, the fact finder's choice between them cannot be manifestly erroneous or clearly wrong. Id.
In this case, the trial court found that the site of the accident on Highway 37 was unreasonably dangerous because of a combination of "unreasonably dangerous failures" that were created by DOTD. The trial court concluded that the "excessive slope of the ditch, the vegetation [obscuring the culvert], and the location of the culvert, all combined to cause the accident." These findings by the trial court were based on extensive evidence presented by numerous witnesses and exhibits. Among the witnesses were plaintiffs' two experts, who examined the evidence concerning the accident in question and testified as to their opinions regarding how the accident happened.
Dwayne Evans, accepted by the trial court as an expert in traffic engineering, testified that the American Association of State Highway and Transportation Officials ("AASHTO") have established guidelines for what they refer to as a "clear zone" area within which there should be no physical obstruction that would cause damage to a vehicle that would come within that "clear zone." Mr. Evans explained that the "clear zone" area is determined by the type of roadway the design speed of the roadway, the volume of traffic on the roadway, and certain other conditions such as the slope of the embankment. He added that AASHTO standards for Highway 37 would require a minimum "clear zone" of 30 feet, but that a desirable "clear zone" would be 40 feet. When asked how far the culvert in question was from the edge of the roadway, Mr. Evans indicated that he *329 measured it to be approximately 28 feet from the edge of Highway 37. Thus, Mr. Evans noted, the culvert was built within the highway's "clear zone," a violation of AASHTO's standards and an unreasonably dangerous condition created by DOTD. When asked about mitigation of the potential hazard from such a condition, Mr. Evans indicated the culvert could have been moved further away from the edge of the roadway or the speed limit could have been reduced.
In addition to the problem with the placement of the culvert, Mr. Evans testified that the visual obstruction of the culvert itself and the non-recoverable slope of the embankment (greater than a 4-to-1 slope) were also unreasonably dangerous conditions. Noting that the culvert was completely covered with grass and shrubs, Mr. Evans explained: "If the driver could have seen that culvert, I don't believe she would have ever steered in that direction. She would have gone on across the ditch, taken a chance the other way. But she could not see what was behind those bushes, so she went in that direction."
Plaintiffs' second expert witness, John Bates, accepted by the trial court as an expert in civil engineering, specializing in traffic accident reconstruction and evaluation of highway design and maintenance, concurred with Mr. Evans regarding the unreasonably dangerous conditions that combined to cause the accident. With regard to the slope of the embankment, Mr. Bates testified that it was too steep and prevented Ms. Howell from recovering once her vehicle was off the roadway. Mr. Bates stated that he took measurements near the culvert and found the slope to be 3-to-1 in some places and even steeper than that in other areas of the embankment. Concerning the culvert, Mr. Bates explained that either it should not have been built within the "clear zone" or it should have been shielded to prevent an errant vehicle from crashing into it. Finally, Mr. Bates testified regarding the vegetation obstructing the culvert. Mr. Bates indicated that according to DOTD standards, all vegetation in front of the culvert should have been trimmed to a height of not greater than 12 inches. Mr. Bates noted that at the time of the accident, the vegetation was so high that Ms. Howell was unable to see the culvert as she was approaching it.
After considering the testimony of the many witnesses and the documentary evidence, the trial court found that although there was driver error in this case, the unreasonably dangerous conditions created by DOTD also combined to cause the accident in question. The trial court's reasons for judgment were extensive and well reasoned:
I do not believe that the vehicle left the roadway on the right. The only evidence of this happening was the testimony of Mrs. McCain, the plaintiff, that there was a bump, and that was it, a four letter word, bump, upon which the experts based a tremendous amount of testimony. But, having said that, I don't believe that it makes a lot of difference in this case, except when we get to the attribution of fault against the driver. Either way there's driver error, whether or not she left the roadway to the right, or whether or not this is one of those unexplained jerk-the-steering-wheel accidents, which is I think the only conclusion I can draw. Eliminating leaving the roadway on the right, and having eliminated a sudden distraction or an animal in the roadway, then driver error is the only possible conclusion in all probability, probably a simple jerk or double jerk of the steering wheel, driver inattentiveness. . . . I believe she lost control of the vehicle in the right lane, *330 and I do believe, however, that the lines in the photographs are in fact yaw marks, and I believe that the opinions of the [plaintiffs'] experts are very valid from that point forward. I further believe that the slope in general of the ditch on the left side was a steep slope, at least a 3-to-1 slope. I believe this was an old roadway and was overlaid at least once, based upon, you know, making an old traditional thoroughfare more amenable to the public's needs, and I don't necessarily think that there was any particular obligation because it was overlaid to go back and [change] the slope at that time to a 4-to-1. I don't think that there's been any specific evidence to that effect. But not withstanding the standards of the department, a 3-to-1 slope for a paved highway, regardless of when the standards went into effect, is an unreasonably dangerous condition, even if it did not violate standards at the time of the overlay. And [plaintiffs' counsel's] comments in opening are well taken, I mean this is a combination of problems, it's not a single, one causation problem that we're dealing with here. . . .
The placement of that culvert, that huge culvert  this is a very, very huge culvert. It was almost six (6) feet in diameter  that close to the roadway was a violation of departmental standards. It violated DOTD's own standards, the location where it was placed. Many other things that could have been done rather than place that culvert where it was including, perhaps, a smaller culvert, I don't know, there's no testimony of that, but certainly moving it farther away from an outside clear zone, which in this case was clearly at least thirty (30) feet, and perhaps as much as sixty (60) feet, according to the testimony of the experts. A ditch could have been channeled farther back, at very low expense to move the culvert back. And if the culvert were farther back, even just a few feet, even outside the thirty (30) feet clear zone, I find specifically that this accident would not have occurred. But even more than that, the culvert, which, because of its placement, did create an unreasonable dangerous condition, was further obscured by . . . high and uncut vegetation. Now this is Louisiana and I don't expect the department to maintain in a perfect condition, you know, the height of the adjacent right-of-way to a highway, but I certainly would expect them to keep unreasonably dangerous conditions open and clear, or clearly viewable to the public. This was a trap. This was a trap for people who are unfortunate enough to leave the roadway and enter that clear zone. The driver's reactions I find were appropriate once she had gotten herself into trouble. She was steering right, back towards the roadway, using efforts to retain control of her vehicle. I think the excessive slope of the ditch, the vegetation, and the location of the culvert, all combined to cause the accident. Perhaps she could have taken other evasive measures had she been able to see the culvert as she approached. But she couldn't see it, she didn't know. It is impossible for me to believe that she would consciously and knowingly guide that vehicle in a head-on collision with a six (6) foot, quarter inch, steel culvert. I think she would have taken any means available to have avoided that, and that which she could not see, she could not avoid. And so that was an unreasonably dangerous condition, the high vegetation obscuring the culvert.
There's been testimony that attenuation of the culvert could have reduced the severity of the impact or, perhaps, even avoided any injuries whatsoever. *331 The defense expert has testified that, well, no duty to attenuate when you're traveling in the opposite direction, and yet a representative of the State, the trooper, himself, testified that [it was] not at all uncommon in a leave-the-roadway-on-the-right situation for a person to lose control and wind up on the left shoulder, not at all uncommon. Well, if the troopers know it, why don't the engineers know it. And so I find that that testimony from the defense safety engineer to be totally unconvincing. I mean, safety is safety is safety, whether it is with directional traffic or with nondirectional traffic, and so I think the culvert easily could have been attenuated which would have avoided this accident, and from a safety standpoint, very, very inexpensive to do, and I think that the State had to know of this problem. I'm not sure under the date of the accident in question that there was a duty or a requirement of actual notice, but I find under the facts of this case that it is impossible to conceive of anyone, any inspector, riding up and down that highway, would not have seen the high vegetation and the location of the culvert, and the reason they knew it, is because they issued the cotton picking permit for the culvert. So they not only knew, but they created the unreasonable dangerous situation. And so under both strict liability analysis and negligent analysis, the State is responsible for this combination of unreasonably dangerous failures. And I know the State is not an insurer, but, quite frankly, in this district, we've had a whole rash of these culvert cases, and they're dangerous. Those culverts located within the clear zone, the emergency zone for motorists who either get themselves into trouble or who are placed into trouble by other motorists, are just really dangerous, and the accidents that result as a result of these culvert accidents tend to be profound injuries, and so the risk is extremely high. The benefit of the culverts are clear, they allow property owners access to the property. But the cost of treatment of these culverts is relatively small in terms of rechanneling the ditches or attenuation. So when I apply a cost benefits analysis to counterweight the high risk created by these culverts, I find that it would be a very inexpensive process. It's not like rebuilding bridges to replace substandard bridges. It's a very inexpensive analysis to address these culverts. Nor is it like having to put a railroad arm at every crossing in the State. All those measures are extremely expensive. This is not. This is not. And so when I apply that balancing test I'm still convinced that this was an unreasonable risk of harm.
The question is apportionment of fault, and I really think that whether or not this is a leaving-the-roadway-on-the-right case may have some affect on the apportionment of fault. No doubt the driver is at fault, but the fault is because of the driver's inattentiveness, and a logical assessment is a 50-50 split on fault.
Having thoroughly reviewed the record, we find no error in the trial court's ruling. Under the facts and circumstances of this case, we agree with the trial court that the failure of Ms. Howell to maintain control of her vehicle did not relieve DOTD of its duty to maintain this off roadway area so that it did not pose an unreasonably dangerous condition to the motoring public. See Aucoin v. State Through Dept. of Transp. and Development, 97-1938, 97-1967, p. 8 (La.4/24/98), 712 So.2d 62, 66-67. The fact that more than one party can contribute to the harm is the reason for our comparative fault system. See Campbell v. Louisiana Dept. *332 of Transp. & Development, 94-1052, p. 7 (La.1/17/95), 648 So.2d 898, 902. The combination of the unrecoverable slope of the embankment, the overgrown vegetation obscuring the culvert, and the placement of the culvert in the "clear zone" rendered this off roadway area unreasonably dangerous to the motoring public. Thus, the trial court was correct in its finding regarding the liability of DOTD and in its assessment of 50 percent of the fault to DOTD for causing the accident in question. DOTD's first two assignments of error are without merit.

EXPERT TESTIMONY OF JOHN BATES

(Assignment of Error Number Three)
DOTD asserts on appeal that the trial court improperly relied on inadmissible hearsay testimony from plaintiffs' expert, Mr. Bates, in reaching a decision concerning the liability of DOTD. We find no merit to this argument.
The testimony in question concerned the permitting of the culvert by DOTD and the timing of same. Plaintiffs' counsel questioned Mr. Bates as follows:
BY [PLAINTIFFS' COUNSEL:]
Q. You submitted to the court a drawing giving an explanation of how AASHTO recommends that this kind of defect be corrected. Why do we look at the 1989 guide and take guidance for a highway that was constructed in  let's say in the `40s?
A. Okay. Your Honor, this big culvert and the driveway above it that we've been talking about leads to property that is owned by Autry Jones. . . . [H]e inherited the property in 1980 and it was just a very few years . . . after that that he decided that he wanted a farm entrance at the location we're talking about. As required by DOTD, he went to the division office, to the permit office, to obtain a driveway permit and presented to them a sketch of the driveway that he had in mind and that includes the culvert location.
He was issued a driveway permit and according to the regulations of DOTD, an inspection needs to be made by the permit office upon completion of that work being done. Mr. Jones doesn't know if the inspection was made because he wasn't just standing around waiting for that to be made. But presumably that inspection was made but it was also permitted by the DOTD in approximately 1985, would be the last date that he had been talking about.
Q. And that's why the 1989 regulations apply?
A. Well, that's what I was trying to show as to what the understanding was of the engineering community of the highway engineers in that era of time. . . .
[COUNSEL FOR PLAINTIFFS:]
We will once again offer, file and introduce the 1989 standards, Judge, as being relatively, at least contemporaneous, with the permitting in 1985 of this driveway.
[COUNSEL FOR DOTD:]
Your Honor, my problem is that  is that the expert just gave us quite a considerable amount of hearsay testimony. All that information brand new to us. When we took their depositions[,] they had no information about when this culvert was put in, how long it had been there, whether it was permitted, that sort of thing. And so now they've got into evidence all this evidence from a witness that I suppose could have been called, that foundation could be laid, we could have our chance to cross-examine them, we could go check the records *333 ourselves. Instead, at the last minute, they use this expert to testify to that. And even if it's correct, that a culvert was put there in the early to mid-`80s, the `89 standards wouldn't apply to that.
THE COURT:
All right. Yes, we have hearsay testimony into evidence. But there it is, it's into evidence. The 1989 Roadside Design Guide has some relevance, albeit, I will note not very much for a 1985 culvert. So the objection is overruled. I'll let it go to the weight.
Louisiana Code of Evidence article 703 provides as follows with regard to opinions and expert testimony:
The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.
Comment (d) to Article 703 adds further that "the facts . . . underlying the expert witness' opinion may properly be . . . under designated circumstances, facts . . . not admissible in evidence (because, for example, their source is inadmissible hearsay), if they are of a kind reasonably relied upon by experts in the particular field in arriving at their opinions or inferences."
As correctly noted by plaintiffs in response to DOTD's appeal, Mr. Bates testified that field interviews, such as the one he conducted with Autry Jones, were one of the many sources of information he relied on in formulating his opinion in this case. The information he learned from Mr. Jones proved helpful to Mr. Bates in determining that the culvert was installed in approximately 1985 and what DOTD standards were in effect at the time of the installation and permitting of the culvert. Based on the unique facts and circumstances of this case, and the guidance from Article 703, we find no error in the trial court's ruling to admit Mr. Bates' testimony into evidence over the objection of counsel for DOTD and allowing it to "go to the weight" of the matter.

DAMAGES

(Assignment of Error Number Four)
In its final assignment of error, DOTD contends the trial court's awards are excessive and higher than other jurisprudential awards for similar injuries. Thus, DOTD maintains, the awards should be reduced.
It is well settled that the trier of fact has much discretion in awarding damages. La. Civ.Code art. 2324.1. The standard for appellate review of general damages is set forth in Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La. 1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994), wherein the Louisiana Supreme Court stated that "the discretion vested in the trier of fact is `great,' and even vast, so that an appellate court should rarely disturb an award of general damages." The appellate court's first inquiry should be "whether the award for the particular injuries and their effects under the particular circumstances on the particular injured person is a clear abuse of the `much discretion' of the trier of fact." Youn, 623 So.2d at 1260. "It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award." Youn, 623 So.2d at 1261.
*334 In the instant case, the evidence adduced at trial revealed a family who suffered catastrophic losses as a result of this tragic accident. Jerry, Jr., who was 5 years old at the time of the accident, sustained the most serious injuries. According to the record, Jerry suffered damage to the frontal and right temporal lobes of his brain. As a result of the strain placed on their relationship in the years following the accident, Margaret and Mike, who had been married since October 1987, separated in 2001, and ultimately divorced in 2005. Mike and the couple's two younger children moved to Nebraska to live, while Margaret and Jerry remained here in Louisiana where she could best provide for him. Although Margaret and Mike both described how they have remained friendly and work together to care for their three children, it is clear from the record that the injuries sustained by Jerry have taken a toll on the entire family.
As previously indicated, the trial court awarded plaintiffs damages totaling $7,786,018.73 in connection with this tragic accident. The damages were broken down as follows:

Colt McCain $ 15,000.00 (general damages)
 $ 167.52 (special damages)
Jerry M. "Mike" McCain $ 125,000.00 (general damages)
 $ 15,386.07 (special damages)
 $ 50,000.00 (loss of consortium-in globo)
Margaret McCain $ 200,000.00 (general damages)
 $ 16,297.07 (special damages)
 $ 300,000.00 (custodial care)
Jerry McCain, Jr. $3,000,000.00 (general damages)
 $4,000,000.00 (special damages-life care plan)
 $ 64,168.07 (special medical damages)

The trial court issued written reasons for judgment regarding the damages awarded. In so doing, the court adopted, as its own, the plaintiffs' memorandum of fact on damages, which provides, in pertinent part, as follows:
COLT E. MCCAIN
On the day of the accident, Colt McCain sat next to his older brother Jerry, seat-belted in the backseat of the vehicle. As a result of the crash, Colt sustained limited physical injuries but suffered from continuous nightmares for five to six months after the accident. Additionally, Colt's emotional distress stemming from the accident forced him to repeat kindergarten.
Colt was seen at the Baton Rouge General Medical Center Emergency Room on the day of the accident. Medical specials for Colt total $167.52. . . .
. . . .
JERRY M. "MIKE" MCCAIN, SR.
JERRY M. MCCAIN, SR., was admitted to Lane Memorial Hospital following the accident, where he remained for approximately seven days before being discharged home. His treating physician, Dr. Howard L. Martin, testified at trial that Mr. McCain was diagnosed with a closed head injury, lacerations to his face, oblique fractures to his mandible and multiple abrasions and contusions. Oral surgical fixation of the fractured mandibles required Mike's jaw being wired shut for several weeks.

*335 As a result of the injuries sustained in the accident, Mike McCain's special damages totaled $15,386.07. . . .
. . . .
MARGARET B. MCCAIN
MARGARET B. MCCAIN was 2½ months pregnant at the time of the accident and sustained injuries consisting of a severely displaced mandibular left angle fracture, a severely displaced mandibular right body fracture, a right clavicular fracture, and a right ankle fracture. Furthermore, Margaret experienced complications with her pregnancy resulting from the accident.
As her treating physician, Dr. Marshal Harrison, (an Oral Surgeon) testified, after being admitted to the Baton Rouge General Medical Center on May 3, 1992, Margaret was taken into surgery where she underwent open reduction and internal fixation of her left mandibular angle fracture and right body fracture of the mandible. Her right leg and ankle were subsequently placed in a cast. Following a dietary consult due to limitation created by the fixation of her jaw, Margaret was discharged home on May 7, 1992.
Special damages for Margaret McCain total $16,297.07. . . .
Additional[ly], Margaret is entitled to special damages for her custodial care of Jerry over the past 12 years. . . .
JERRY M. MCCAIN, JR.
JERRY M. MCCAIN, JR., suffered the most severe injuries of the four plaintiffs as a result of the May 3, 1992 accident. Before that day, Jerry was a bright inquisitive 5 year old boy, but after the accident, his life was dramatically altered. On that afternoon, Jerry was transported to Baton Rouge General Medical Center emergency room where he was diagnosed with Coma secondary to closed head injury. After a few weeks, Jerry was transferred to Children's Hospital in New Orleans under the care of pediatric neurosurgeon, Dr. Joseph Nadell. In his trial testimony, Dr. Nadell described Jerry's injuries as follows:
"Predominantly the frontal lobes and his right temporal lobe were damaged. . . . And clinically he exhibits both language, which is temporal and frontal lobe and personality and things like that which is predominantly frontal-lobe dysfunction." . . .
. . . .
Following his release from Children's Hospital, Jerry returned home to begin the long and often impossible process of daily life. Over the past 12 years, Jerry has been unable to attend regular schools, requiring special educational classes and eventually being unable to perform, even in such specialized courses. As his family testified, he has problems with his memory and attention span, which make normal daily activities impossible and which require almost constant supervision.
As his current treating psychiatrist, Dr. Ann Arretteig, testified, Jerry is and always will be a danger to himself and to those around him. This is so because the injuries to his brain, especially the frontal lobe injuries, have permanently eliminated his inhibitions, judgment and maturity, making him susceptible to violent outbursts, both verbal and physical. Thus, all social activities, such as courtship and marriage, maintenance of friendships and normal family relations, education and employment are out of the question for Jerry McCain. What remains is a life of constant agitation, uncontrolled anger and inappropriate and offensive behavior.
Without constant monitoring by his mother, he would not have survived over *336 the past 12 years. The passage of time has demonstrated the profound and devastating impact Jerry's injuries have had on him and his family. The future cost of caring for Jerry was demonstrated at trial, as was the overwhelming emotional loss to him and his family.
. . . .
Medical specials sustained as a result of the accident total $64,168.07. . . .
. . . .
Although Jerry McCain is not a quadraplegic [sic], the injuries to his brain, caused by the accident are of similar magnitude. He can walk and use his extremities, but the destruction of his frontal lobes creates a different set of medical challenges. . . .
The need to supervise and manage Jerry's daily activities (to prevent injury to himself and others) is a permanent and ongoing requirement. The cost of such care is taken into account in the testimony of Thomas Mungall, plaintiffs' life care planner. At trial, the physical and emotional cost of these terrible injuries was clearly demonstrated in the testimony of Jerry's family members and his physicians.
Before this accident, Jerry was an active, intelligent and normal child. Since the accident, his parents had to reconcile themselves to the fact that their healthy, loving child no longer existed. In his place was one who required constant attention, who exposed himself and his family to dangerous outbursts, violent and abhorrent behavior, irrational actions and who showed none of the affection and loving nature which had previously defined him as their son.
Based on our thorough review of the evidence in the record, we find no abuse of discretion by the trial court in the damages awarded. Given the "particular injuries and their effects under the particular circumstances" on the plaintiffs, the trial court's damage awards are not beyond that which a reasonable trier of fact could assess. See Youn, 623 So.2d at 1260.

CONCLUSION
For the above and foregoing reasons, we affirm the trial court's judgment in all respects. Appeal costs in the amount of $1,132.00 are assessed against DOTD.
AFFIRMED.
NOTES
[1] We note that DOTD actually appealed from the trial court's denial of its motion for new trial, which is not an appealable judgment absent a showing of irreparable harm. Pittman v. Pittman, 2001-2528, p. 3 (La.App. 1 Cir. 12/20/02), 836 So.2d 369, 372, writ denied, XXXX-XXXX (La.9/19/03), 853 So.2d 642. However, the supreme court has directed us to consider an appeal of the denial of a motion for new trial as an appeal of the judgment on the merits as well, when it is clear from the appellant's brief that he intended to appeal the merits of the case. Shultz v. Shultz, 2002-2534, p. 3 (La.App. 1 Cir. 11/7/03), 867 So.2d 745, 746-747 (quoting Carpenter v. Hannan, XXXX-XXXX, p. 4 (La. App. 1 Cir. 3/28/02), 818 So.2d 226, 228-229, writ denied, XXXX-XXXX (La.10/25/02, 827 So.2d 1153). 827 So.2d 1153). It is obvious from DOTD's brief that it intended to appeal the judgment on the merits. Thus, we will treat the appeal accordingly.