KUMAR K. AMARANENI,
v.
MARSHA LACROIX AMARANENI.
No. 2009 CA 1179.
Court of Appeals of Louisiana, First Circuit.
February 12, 2010.
Not Designated for Publication
P. J. STAKELUM, III, PAOLA P. CORRADA, and ROBERT A. BARNETT, Counsel for Plaintiff/Appellant, Kumar K. Amaraneni.
JONES FUSSELL, MARGARET H. KERN, Counsel for Defendant/Appellee, Marsha Lacroix Amaraneni.
Before: DOWNING, GAIDRY and McCLENDON, JJ.
GAIDRY, J.
In this action involving a community property partition, the plaintiff has appealed a trial court judgment partitioning the remaining community property, as well as a judgment denying his motion for new trial. For the reasons outlined below, we affirm.

FACTS AND PROCEDURAL HISTORY
Dr. Kumar Amaraneni and Marsha Lacroix Amaraneni were married on November 21, 1983. A petition for divorce was filed by Dr. Amaraneni on August 6, 2003, and a judgment of divorce was entered on October 6, 2004. The Amaranenis partially partitioned the community of acquets and gains in an April 2005 consent judgment. The trial for partition of the remaining community property was continued several times. On the August 15, 2008 trial date, the parties stipulated to the appointment of a special master. The trial court appointed Bruce Miller Special Master pursuant to La. R.S. 13:4165, which provides:
A. Pursuant to the inherent judicial power of the court and upon its own motion and with the consent of all parties litigant, the court may enter an order appointing a special master in any civil action wherein complicated legal or factual issues are presented or wherein exceptional circumstances of the case warrant such appointment.
B. The order appointing a special master may specify or limit the master's powers. Subject to such specifications or limitations, the master has and shall exercise the power to regulate all proceedings before him and to do all acts and take all measures necessary or proper for the efficient performance of his duties.
C. (1) The court may order the master to prepare a report upon the matters submitted to him and, if in the course of his duties he is required to make findings of facts or conclusions of law, the order may further require that the master include in his report information with respect to such findings or conclusions.
(2) The report shall be filed with the clerk of court and notice of such filing shall be served upon all parties.
(3) Within ten days after being served with notice of the filing of the report, any party may file a written objection thereto. After a contradictory hearing, the court may adopt the report, modify it, reject it in whole or in part, receive further evidence, or recommit it with instructions. If no timely objection is filed, the court shall adopt the report as submitted, unless clearly erroneous.
D. The master's compensation shall be reasonable, fixed by the court, and taxed as costs of court.
The August 21, 2008 Stipulated Order appointing Miller Special Master vested him with "all powers as outlined in La. R.S. 13:4165," and provided that "his decisions and recommendations shall be adjudicated in accordance with the terms of that statute." The Stipulated Order required him to provide a report to the court on "all issues arising from the partition of the community of acquets and gains formerly existing between Kumar Amaraneni and Marsha Amaraneni." The time frame for the process, as set forth in the Stipulated Order, was as follows:
[T]he Special Master shall take up the pending partition issues as soon as possible. Both parties, their counsel and their experts shall comply to the best of his and/her ability and in good faith with all deadlines set by the Special Master for conferences and/or for production of additional submissions or documents and/or requests for additional information as may be required by the Special Master.
[T]he Special Master shall submit a report to the Court on or before September 8, 2008 on the valuation of the community assets, and addressing the parties' respective reimbursement claims and accounting claims, and recommending to the Court the manner in which the assets of the community should be allocated between the parties. Should the Special Master require additional time beyond September 8, 2008 in which to complete his report, he shall notify the Court and counsel for the parties, and this Order shall be amended to provide an extension or the date for the submission of the report.
[A]ny objections to the Special Master's report shall be filed no later than ten days after the filing of the report, as provided in LSA-R.S. 13:4165. Objections to the Special Master's report, if any, shall be set for hearing on November 12, 2008. In no event shall the deadline for the filing of the Special Master's report be extended beyond a date which would permit the parties to timely file objections to the report at least ten days prior to the November 12, 2008 hearing set herein above.
After being notified of his appointment on August 20, 2008, the Special Master sent a letter to the parties requesting that they submit all information they wished to have considered to him. Because of scheduling difficulties, the first date on which the attorneys for the parties were available to meet with the Special Master was September 18, 2008, ten days past the court's original deadline for submission of the Special Master's report. At that first meeting, it became clear to the Special Master that he still did not have all of the information he needed in order to prepare a report on the issues, so the parties agreed on a second meeting date of October 27, 2008. The Special Master testified that the attorneys for the parties did not object to these extensions of the deadline for filing his report, and the meeting dates were mutually agreed upon, so he did not notify the court of the delays. The Special Master's completed report was faxed to the parties and filed with the court on November 3, 2008.
Dr. Amaraneni filed an opposition to the report stating various objections to the Special Master's recommendations. He also requested a continuance so that he could take the deposition of a "State Representative to expound upon the intent of R.S. 9:2801.2" and "an economist or expert in statistical analysis to demonstrate the unsound consideration of [the Special Master]." The continuance was denied and the contradictory hearing was held on the matter as scheduled on November 12, 2008.
At the hearing, Dr. Amaraneni's counsel objected to the denial of the continuance on the grounds that he was denied the full statutory period within which to file an opposition and call "the necessary witnesses that we thought were necessary in light of Mr. Miller's report to testify." The court noted that there had been at least three continuances at the request of Dr. Amaraneni, and to prolong the hearing any longer would be an injustice to both parties. The court further stated that the parties were to have submitted all evidence they wished to have considered in the matter to the Special Master prior to the preparation of his report, and they would not be allowed to call any witnesses or present any additional evidence which was not submitted to the Special Master.
At the hearing, the court went through each recommendation in the Special Master's report and allowed both parties the opportunity to present arguments to the court regarding the recommendations. The Special Master was also present and testified at the hearing. He informed the court that he based his recommendations on the information that was supplied to him by both sides, as well as individual meetings with counsel for each side and their experts.
After the contradictory hearing, the trial court rendered a judgment of partition which stated:
The Court has considered the report of [the] Special Master, and after hearing the objections of the parties to his report, has determined that sufficient legal and factual support exists for the conclusions of the Special Master with regard to the classification and valuation of the assets and liabilities of the community of acquets and gains formerly existing between [the parties]. The Court has further determined that sufficient legal and factual support exists for the allocation by the Special Master of income derived from the community corporation and limited liability companies subsequent to the filing of the petition for divorce, corrected as specifically as directed on the record at the hearing on November 12, 2008, and as set forth in the Amended Proces Verbal of the Special Master filed herein on November 21, 2008. Finally, the Court has determined that a judgment of partition should be entered herein allocating the assets and liabilities of the former community as recommended by the Special Master in the Amended Proces Verbal of the Special Master filed herein on November 21, 2008.
Dr. Amaraneni filed a motion for new trial, which was denied, and this appeal followed, raising the following assignment of errors:
1. The trial court erred in excluding all testimony relating to the grounds for the objections to the Special Master's report and recommendation.
2. The trial court erred in classifying the post-petition income of Emergency Medicine Physicians and Services, Inc. ("EMPS") as community income instead of as the post-community separate earnings of Dr. Amaraneni.
3. The trial court erred in including goodwill in the valuation of Dr. Amaraneni's 50% interest in Naeem & Kumar, L.L.C. ("N&K").
4. The trial court erred in classifying the post-petition income of N&K attributable to Dr. Amaraneni's 50% interest in N&K as the fruits of a community asset instead of as the separate earnings of Dr. Amaraneni.
5. The trial court erred in allocating the Old Spanish Trail lots to Dr. Amaraneni, given the cash equalization payment otherwise required.

DISCUSSION

Exclusion of Testimony
Dr. Amaraneni first argues that the trial court erred in not allowing him a full-scale trial because his consent to the special master proceeding, as required by La. R.S. 13:4165, was lacking. Although the Special Master's appointment was made via a Stipulated Judgment, Dr. Amaraneni argues that his consent was lacking because he was not afforded the full ten-day time period to file his objections.
This argument has no merit. As noted above, the delays in the preparation of the Special Master's report were primarily related to the parties' delays in providing information to the Special Master for consideration and their availability to meet with him. The Special Master testified at the hearing that although he was aware that the report was to be filed at least ten days prior to the hearing date, these delays combined with an additional short delay resulting from his elderly mother's illness prevented him from filing the report until November 3. The purpose of the ten-day period is to allow the parties to file objections to the Special Master's report. Although the Special Master's report was filed nine days prior to the hearing date, Dr. Amaraneni did in fact file his objection to the Special Master's report prior to the hearing and thus was not prejudiced by this delay; therefore, we do not find that his consent was vitiated by the delay and find no error in the trial court's use of the Special Master process.
Dr. Amaraneni further alleges that the trial court erred in excluding evidence at the November 12, 2008 trial of the partition, and that the court's refusal to swear witnesses and take testimony before accepting the recommendations of the Special Master was reversible error in that it denied Dr. Amaraneni the opportunity to introduce evidence of several factual and legal errors by the Special Master that ultimately "resulted in a grossly disproportionate partition of the remaining community property and an unwarranted equalizing cash payment by Dr. Amaraneni of over one million dollars."
The provisions of La. R.S. 13:4165 allow a special master to make findings of fact and conclusions of law, and the consent judgment appointing the Special Master in this case specifically vests him with "all powers" outlined in the statute. Thus, it was clearly contemplated by the parties that the Special Master would be making findings of fact and conclusions of law in this case.
Furthermore, La. R.S. 13:4165 states that a court may receive new evidence before accepting the Special Master's recommendations; the court is not required to do so. As noted above, the parties were instructed to provide the Special Master with everything they wished to have considered. Under these circumstances, the trial court did not abuse his discretion in choosing not to receive new evidence at the hearing.

Classification of EMPS Post-Petition Income
In his second assignment of error, Dr. Amaraneni argues that the trial court erred in classifying a portion of the post-petition distributions from EMPS as civil fruits of a community asset rather than as his separate earnings.
EMPS is an S Corporation which contracted to provide emergency medical services to Slidell Memorial Hospital (SMH). Dr. Amaraneni is the sole shareholder of EMPS. In June of 2003, prior to the filing of the petition for divorce, EMPS entered into a contract with SMH providing that in exchange for EMPS staffing SMH's emergency room with one emergency room physician twenty-four hours a day, seven days a week, fifty-two weeks per year, and an additional emergency room physician ten hours a day, seven days a week, fifty-two weeks per year, for the period of June 1, 2003 through May 31, 2008, SMH would pay EMPS the sum of $1,940,000.00.[1] The contract provides for additional payments of $50,000.00 per year for Dr. Amaraneni to serve as the Medical Director of the SMH Emergency Department. EMPS employed a number of physicians to staff the SMH emergency room in accordance with the terms of the contract. In addition to these physicians, Dr. Amaraneni also worked some shifts as an emergency room physician in the SMH Emergency Room.
Mrs. Amaraneni acknowledges that any post-termination payments made to Dr. Amaraneni under the contract for his services as Medical Director of the SMH Emergency Room are his separate property, as are any payments made for his individual performance of emergency room physician services. Mrs. Amaraneni seeks only her share of the EMPS profits arising from the contract, which was executed during the marriage. While he does not dispute that the stock of EMPS is a community asset, in that it was acquired by him during the marriage, Dr. Amaraneni argues that there was no EMPS profit to be shared; rather, he asserts that the entire contract price, less overhead and the cost of the contract physicians, is his fair compensation for physician and administrative services rendered and is therefore his separate property.
Initially, we note that appellate review of a trial court's classification of property as community or separate is governed by the manifest error-clearly wrong standard. Rao v. Rao, 05-0059 p. 6 (La.App. 1 Cir. 11/4/05), 927 So.2d 356, 360, writ denied, 05-2453 (La. 3/24/06), 925 So.2d 1232.
In addressing Dr. Amaraneni's claim that there was no profit after his fair compensation for his services, the Special Master attempted to ascertain the value of Dr. Amaraneni's services provided after the termination of the community. The information provided to the Special Master pertinent to this issue consisted of various documentation, including the EMPS-SMH contract and tax returns; the opinions of the parties' experts; and Dr. Amaraneni's deposition. The five-year, $1,940,000.00 contract, which was a successor to other similar contracts between EMPS and SMH, was negotiated and entered into by Dr. Amaraneni on behalf of EMPS during the parties' marriage. Although it was up to the parties to provide the Special Master with any information they wished to have considered, the Special Master asked Dr. Amaraneni to submit any documentation, proof, or statements he may have regarding the amount of his personal versus non-personal portion of the income from the contract to assist him in making his determination. The Special Master noted in his report that Dr. Amaraneni supplied him with no such documentation, and he was forced to rely on Dr. Amaraneni's deposition testimony regarding this issue. Dr. Amaraneni's deposition testimony was vague, and he was unable to answer many questions regarding what services he performed for or on behalf of EMPS, what compensation he received for his efforts, and whether EMPS ever generated a profit. The Special Master obviously concluded that the only portion of the distributions which were attributable to Dr. Amaraneni's effort, skill, or industry after the termination of the community were those which compensated him for physician services and administrative services. Considering all the information supplied to him by the parties and his meetings with the parties' attorneys and experts, the Special Master set an amount for Dr. Amaraneni's compensation for physician services and administrative services, and subtracted those amounts from the distributions to determine the community portion. After reviewing the information provided to the Special Master by the parties to make his decision, we cannot say that the court was manifestly erroneous or clearly wrong in accepting the Special Master's recommendation regarding this classification.
In addition to his assertion that the trial court erred in classifying a portion of the income from EMPS as civil fruits of the community asset, Dr. Amaraneni also argues that the "methodology used to value those `fruits' was itself highly flawed." However, Dr. Amaraneni raised no objections to the Special Master's valuation of the EMPS income in his opposition to the Special Master's report, nor did he object to the Special Master's recommendation regarding the valuation at the contradictory hearing. As this issue is raised for the first time on appeal, it will not be considered.
Dr. Amaraneni also argues that the trial court erred in adjusting the amount of the income due Mrs. Amaraneni from EMPS to reflect her lower tax rate based upon the recommendation of the Special Master. The Special Master informed the court at the contradictory hearing that he is a Board-certified tax attorney, that he reviewed both Dr. Amaraneni's tax returns and Mrs. Amaraneni's tax returns, that he had the benefit of input from both parties' experts, and he recommended that the court adjust the amount of EMPS income due to Mrs. Amaraneni from Dr. Amaraneni to reflect her reduced tax rate. The trial court accepted this recommendation. Dr. Amaraneni argues on appeal that this adjustment "completely ignores the nature of an S Corporation and the manner in which its income is taxed under the federal tax code" and that Dr. Amaraneni was "statutorily mandated to report all of EMPS' net taxable income on his personal tax return." Dr. Amaraneni cites no authority to support his argument on appeal, nor does any of the proffered expert testimony from his accountants dispute the reduced tax rate. The trial court considered both rates and the recommendation of the Special Master, a Board-certified tax attorney, and gave Mrs. Amaraneni the benefit of the reduced rate. Without expert testimony that the rate applied was wrong, we cannot say that the trial court erred in so doing.

Valuation of N&K
In his next assignment of error, Dr. Amaraneni alleges that the trial court erred in including goodwill in the valuation of the community's fiftypercent interest in N&K.
N&K, a limited liability company formed during the marriage by Dr. Amaraneni and Dr. Mohammed Naeem, operates an urgent care facility called Pelican Urgent Care. N&K does not own the building in which the urgent care facility is housed. Dr. Amaraneni alleges that the community's fifty-percent interest in N&K has no value pursuant to La. R.S. 9:2801.2, which provides that:
In a proceeding to partition the community, the court may include, in the valuation of any community-owned corporate, commercial, or professional business, the goodwill of the business. However, that portion of the goodwill attributable to any personal quality of the spouse awarded the business shall not be included in the valuation of a business.
Dr. Amaraneni asserts that N&K has no value apart from goodwill attributable to his personal qualities. In determining what portion of the goodwill of the business was attributable to Dr. Amaraneni's personal qualities, the Special Master was again limited primarily to Dr. Amaraneni's somewhat vague deposition testimony. Dr. Amaraneni testified that he does not regularly perform physician services at Pelican Urgent Care; rather, he only works a shift as a physician when none of the regular physicians can be found to cover a shift and he is available. He testified that patients are not able to call and schedule an appointment to see him, and several months sometimes pass without him working a single shift at Pelican Urgent Care. Despite this testimony, he alleged that it is his name and reputation that bring in patients. Dr. Amaraneni also testified that a manager, Bruce Kiger, handles the day-to-day running of the clinic and hiring of employees, and Dr. Amaraneni visits Pelican Urgent Care to check on the business and meet with the manager when he has free time. Although he does not keep track of his time spent dealing with the business of N&K, he estimated that he spends ten to twenty hours per week on business related to N&K.
Dr. Amaraneni cites this court's opinion in Rao v. Rao, 05-0059 (La.App. 1 Cir. 11/4/05), 927 So.2d 356, in support of his argument that even though he rarely worked a shift at Pelican Urgent Care, any goodwill attributable to the personal qualities of the doctors who did work at Pelican Urgent Care should likewise be excluded from the valuation. In the cited case, Dr. Rao was one of six physicians who owned equal interests in several entities: a medical group, a corporation that operated an outpatient surgical center, and a company that owned the building in which the physicians' offices and the outpatient surgical center were housed. The valuation of Dr. Rao's interest in the corporation operating the surgical facility was at issue in his community property partition. This court noted that each of the six physicians used the surgical facility as part of their professional practice and concluded that it was intended by the parties to be an extension of their professional medical practice group. As such, this court concluded that it was inappropriate to include goodwill attributable to Dr. Rao's professional, personal qualities or those of any of the other physician stockholders in the valuation of the community corporate stock. Id. at p. 15, 365-66. Dr. Amaraneni's situation is distinguishable from Rao in that Dr. Amaraneni is not operating his professional practice out of Pelican Urgent Care; it cannot be said to be an extension of his professional medical practice group. Thus, any goodwill attributable to the professional, personal qualities of the physicians who do work there would not be excluded from the valuation of the community's interest in the company.
The Special Master and the trial court found his testimony that patients visit the facility because of his reputation not credible. Although Dr. Amaraneni's name can be found on a wall inside the facility, it is not part of the name of the facility, and patients cannot schedule an appointment with Dr. Amaraneni. And although N&K also has contracts for occupational medicine services, Dr. Amaraneni could not recall at his deposition who negotiated those contracts or when they were negotiated. Based on the evidence before him, the Special Master concluded that the urgent care facility was a business venture for Dr. Amaraneni and not an extension of his medical practice, and the goodwill of the business was not attributable to his professional, personal qualities.
Dr. Amaraneni argues on appeal that the goodwill of N&K was attributable to his personal qualities because it was his personal qualities and business skill that turned N&K from an unprofitable venture into a profitable one. However, the facts to which he refers in his argument on appeal were not presented to the Special Master. He was asked several times at his deposition about what services he provided to N&K, and he provided very vague, if any, answers. As noted above, the parties were instructed to provide the Special Master with all information they wished to have him consider. Dr. Amaraneni failed to provide this information to the Special Master, and the Special Master was forced to prepare his report using the information before him. Based on the information before the Special Master when he prepared his report and the court at the time of the contradictory hearing, we find no manifest error in the court's conclusion to include goodwill in the valuation of N&K.

Classification of N&K Post-Petition Income
Dr. Amaraneni next argues that the court erred in classifying the postpetition income attributable to Dr. Amaraneni from N&K as the fruits of a community asset rather than as Dr. Amaraneni's separate earnings. The basis for this argument is that the post-petition income was "attributable to Dr. Amaraneni's efforts in turning the practice around following his assumption of day-to-day managerial responsibility in July 2004." Dr. Amaraneni suggests that prior to July 2004, when Dr. Naeem was overseeing N&K, the company consistently lost money, but under his leadership, profits increased each year.
Again, the Special Master was limited to the evidence before him at the time he made his recommendation. And as stated above, the evidence before the Special Master contained very little about Dr. Amaraneni's efforts with regard to N&K. We find no manifest error in the court's factual finding that Dr. Amaraneni's personal qualities had little to do with N&K's business, and although Dr. Amaraneni's proffer and his brief contain details about Dr. Amaraneni's efforts in turning the business of N&K around, that information was not submitted to the Special Master, and it was within the trial court's discretion to decline to receive any evidence not submitted to the Special Master. Therefore, we find no manifest error in the trial court's conclusion that the community interest in the post-petition income of N&K was fruit of a community asset rather than Dr. Amaraneni's separate earnings.
Dr. Amaraneni also argues that the trial court erred in adjusting the tax rate used in calculating the community interest in the income of N&K to reflect Mrs. Amaraneni's lower tax rate. His position is that the income of N&K is required to be taxed to the members in proportion to their interests, so Dr. Amaraneni was required to report fifty percent of N&K's income on his personal income tax return regardless of whether he paid Mrs. Amaraneni her community share or not. As with the similar tax issue with regard to the community income from EMPS, Dr. Amaraneni cited no authority for his arguments on appeal and offered no expert testimony on the issue in his proffer. The trial court considered both rates and the recommendation of the Special Master, a Board-certified tax attorney, and gave Mrs. Amaraneni the benefit of the reduced tax rate. Without expert testimony that the rate applied was wrong, we cannot say that the trial court erred in so doing.

Old Spanish Trail Lots
In his final assignment of error, Dr. Amaraneni argues that the trial court erred in allocating the Old Spanish Trail lots to him rather than to Mrs. Amaraneni, given the cash equalization payment otherwise required.
The Amaranenis initially acquired an undivided fifty-percent interest in lots 12-22 of the Terrace Park Subdivision ("Old Spanish Trail lots") during the marriage. After the termination of the marriage, Dr. Amaraneni purchased their co-owners' interest.
In his report, the Special Master valued the Old Spanish Trail lots at $183,000.00 and recommended allocating the lots to Dr. Amaraneni. In the section of the report entitled "Recapitulation of Assets," the Special Master listed the Old Spanish Trail lots under the heading indicating assets allocated to Dr. Amaraneni.
Despite the fact that the Special Master clearly recommended that the Old Spanish Trail lots be allocated to Dr. Amaraneni, Dr. Amaraneni's opposition to the Special Master's report stated that he agreed with the Special Master's recommendation as to the value of the property and "[t]he disposition of ownership or transfer has not been determined." Furthermore, at the November 12 hearing on the objections to the Special Master's report, no objection whatsoever was made to the Special Master's recommendation that the lots be allocated to Dr. Amaraneni. Specifically, Dr. Amaraneni's attorney stated that the "only problem" with the Old Spanish Trail lots was reimbursement for mortgage payments made by Dr. Amaraneni on the lots after the termination of the marriage. Finally, in his motion for new trial, Dr. Amaraneni raised no objection to the allocation of these lots to him in the partition.
In deciding to whom an asset or liability shall be allocated, the court shall consider the nature and source of the asset or liability, the economic condition of each spouse, and any other circumstances the court deems relevant. La. R.S. 9:2801 (A)(4)(c); Williams v. Williams, 2006-2491, p. 12 (La.App. 1 Cir. 9/14/07), 970 So.2d 633, 641. The trial court's allocation or assigning of assets and liabilities in the partition of community property is reviewed under the abuse of discretion standard. Id. Given that Dr. Amaraneni failed to object to the allocation of the lots to him when given the chance to do so, we find no abuse of discretion in the trial court's decision to accept the Special Master's recommendation to allocate the Old Spanish Trail lots to Dr. Amaraneni. This assignment of error is without merit.

DECREE
The judgment of the trial court is affirmed. Costs of this appeal are assessed to Dr. Kumar Amaraneni.
AFFIRMED.
McCLENDON, J., concurs and assigns reasons.
Although Dr. Amaraneni asserts that the trial court erred in failing to allow him to present additional evidence following his objection to the findings of the special master, a review of the proferred testimony does not provide any basis for a reversal. Thus, I concur with the result reached by the majority.
NOTES
[1] The contract contained a provision allowing this sum to be increased over the term of the contract to account for inflation.